THIRD DIVISION

June 10, 1998 

No. 1-96-4210

LISA MORAN, )

)

Plaintiff-Appellant, ) APPEAL FROM THE CIRCUIT

) COURT OF COOK COUNTY

v. )

)

ANNE ERICKSON, Special ) HONORABLE WALTER J.

Administrator of the Estate of ) KOWALSKI, JUDGE

PAUL LONERGAN, Deceased, ) PRESIDING.

)

Defendant-Appellee. )

JUSTICE GORDON DELIVERED THE OPINION OF THE COURT:

Plaintiff, Lisa Moran, brought the instant action against the estate of Paul Lonergan seeking to recover for personal injuries she sustained from the admitted negligent operation of an automobile by Lonergan.  The matter proceeded to trial on the issue of damages, and the jury returned a verdict in favor of Lonergan's estate.  On appeal the plaintiff argues that she is entitled to judgment notwithstanding the verdict or a new trial because the verdict was against the overwhelming weight of the evidence and, alternatively, that she is entitled to a new trial due to erroneous admission of evidence and the improper use of records to refresh recollection.  For the reasons discussed below, we affirm.

BACKGROUND FACTS

At trial, the plaintiff testified that on November 30, 1989, she was involved in an automobile collision which caused her knees to "hit the dash.   She stated that her knees felt like they were broken.  She was taken to Evanston Hospital by ambulance where x-rays were taken.  Apparently, the x-rays did not disclose any fractures or "hard tissue injuries"; and the plaintiff was not hospitalized.  The plaintiff further testified that on December 1, 1989 she awoke to "pain from head to toe" and went to her internist, Ann Niedenthal, who sent her for x-rays and prescribed medication for whiplash.  A couple of months later, Niedenthal sent the plaintiff to David Carey for physical therapy.  Carey performed therapy on the plaintiff, initially on her neck and then on her knees, until December of 1990 or January 1991.  In April 1990, Niederthal referred the plaintiff to Doctor McMillan, an orthopedic surgeon, because plaintiff's knees were still swollen.

The plaintiff testified to treatment rendered to her by the following medical professionals:  Doctors McMillan and Sweeney, orthopedic surgeons; David Carey, a physical therapist; Doctor McMahon, a neurologist; Lynn Robinson, a physical therapist; and Doctor Tovian, a psychologist.  She also testified to medical visits in 1992 with Doctors Hefferon, Hill and Sheinkop who rendered medical opinions regarding plaintiff's need for arthroscopic surgery which was performed on her left knee by Doctor Hill in 1992.  The plaintiff testified to her use of knee braces for long-distance walking, a neck brace for long automobile trips and while sitting for extended periods of time, and crutches after the arthroscopic surgery.  She testified to the pain she experienced since the automobile collision and to the limitations that her injuries caused with respect to her ability to interact with her children and to maintain her home.  She described incidents of falling when her knees would lock but stated she fell less and did not have severe pain in her knees since the arthroscopic surgery.  The plaintiff explained the physical therapy she had undergone during the period after her knee surgery until July 1996 and testified that she continues with physical therapy on her own.

On cross-examination, the plaintiff testified that she did not see any medical providers from December 1, 1989 to February 4, 1990 and that during that time she vacationed in Disney World and Galena, Illinois.  She admitted that the Disney World trip began two days after the automobile collision.  She also admitted that she may have ridden horses in Galena from which she returned on February 4, one day before her physical therapy with David Carey began.  She denied telling Carey that she played five games of tennis on June 10, 1990 or several games of tennis on July 1, 1990 and insisted that she had not played a full game of tennis since the automobile accident.  She stated that she had unsuccessfully tried to play tennis on two occasions, in June and in the fall of 1990, pursuant to the advice of her doctor and Carey.

The plaintiff presented testimony by the following treating physicians and health care providers:  Doctor John McMahon, a board-certified neurologist; Doctor Warren Baskin, a licensed chiropractor; Doctor Robert Hozman, a board-certified internist and rheumatologist; and Doctor James A. Hill, a board-certified orthopedic surgeon.  Each testified to the dates they saw the plaintiff, the reason for the visits, the plaintiff's complaints regarding her physical condition, their medical diagnoses, and the medical treatment rendered to the plaintiff.

Doctor John McMahon testified that the plaintiff had been referred to him by her orthopedic surgeon, Howard Sweeney, for an evaluation of her neck.  He stated that he first saw the plaintff on April 10, 1991.  She was pregnant at that time.  He examined the plaintiff and obtained her medical history.  McMahon testified concerning the physical complaints made by the plaintiff to him and concerning his physical examination of her.  At that time, McMahon concluded that the plaintiff suffered from inflammation or irritation of the nerve root which he characterized as cervical radiculitis.  He recommended that the plaintiff undergo cervical physical therapy.

McMahon testified that he also examined the plaintiff on June 17, 1991.  He stated that the plaintiff indicated to him that her physical condition had improved while she was undergoing physical therapy.  She told him she was again experiencing neck pain, knee pain and hand sensory symptoms since she had been discharged from physical therapy eleven days earlier.  McMahon believed that the plaintiff's wrist sensitivity was symptomatic of transient carpal tunnel syndrome which disappears after pregnancy.  McMahon testified that he believed the plaintiff continued to suffer from cervical radiculitis and he resumed physical therapy because of her headaches, neck pain and arm symptoms.  With respect to the relationship between plaintiff's condition and the automobile collision on November 30, 1989, McMahon testified:

"I assumed the auto accident to be the cause of the symptoms because of the temporal relationship of the plaintiff's symptoms to that accident.  They came on after it in close proximity.  And there was nothing else in her history to which they seem attributable."  

He further stated that, in his opinion, the plaintiff was in pain when he examined her in April and June 1991 and that he "had no reason to think she was faking."

On cross-examination, McMahon stated that intermittent discomfort, numbness and tingling in the hands and wrist area are symptomatic of carpel tunnel syndrome as well as cervical radiculitis.  He determined that the carpel tunnel syndrome was not related to the accident because the plaintiff's symptoms had not been present during her first visit with him.  He admitted that the results of the tests he performed upon the plaintiff during his physical examination of her were determined exclusively by her subjective indications of pain, her general demeanor and the manner in which she postured her body.  He stated that a good actor could present a picture of pain.  He admitted that his opinion that the plaintiff's pain was caused by the automobile accident was based upon what the plaintiff told him.  He also stated that he received a letter in June 1991 from a physical therapist, Lynn Robinson, who indicated that on two occasions she observed the plaintiff perform cervical motions while attending to her child that would have caused her to complain during physical therapy sessions.

Doctor Warren Baskin, a licensed chiropractor, testified that the plaintiff was referred to him in June 1993 by Doctor Hill for diagnosis and treatment of musculoskeletal pains other than those emanating in the knee.  He stated that Doctor Hill dealt exclusively with knees problems.  During his examination, the plaintiff experienced pain in the neck, mid-back, lower back, hip and knee.  According to Baskin's notes, the plaintiff indicated that she could not walk two inches without support.  He concluded that she suffered from fibromyalgia, a syndrome of diffused musculoskeletal pain throughout the body, concomitant with post-traumatic cervical sprain, also known as whiplash, and disc syndrome in the lower back.  Baskin performed therapy on the plaintiff from June 1993 to September 1993.  Baskin admitted on cross-examination that his diagnosis of the plaintiff was based upon his examination of her and her corresponding indications of pain; her history of pain; and her disclosures regarding physical activities that she could not do.  He also admitted that his opinions were based upon what the plaintiff told him she felt in terms of pain and what she told him she could physically do.  He could not say that the plaintiff's pain was caused by the accident.

Doctor Robert Hozman, a physician board certified in internal medicine and rheumatology testified that he first saw the plaintiff in October 18, 1993.  At that time he obtained a medical history from her and conducted a physical musculoskeletal examination of her.  He determined within a reasonable degree of medical certainty that the plaintiff had fibromyalgia.  Hozman testified concerning his treatment of the plaintiff, the lack of significant improvement, and his belief that her condition was permanent and that she would continue to require medication, physical therapy and exercise.  He testified that the pain the plaintiff exhibited during examination was real.  He stated that patients with fibromyalgia appear normal to others and can have good days and bad days as the pain migrates and "waxes and wanes."  He stated that patients with fibromyalgia are often seen by psychologists who help them deal with pain and stress reduction.  In his opinion, the plaintiff did not have fibromyalgia prior to the accident on November 30, 1989; and the fibromyalgia was causally related to the accident.

On cross-examination, Hozman testified that the plaintiff indicated to him that she had difficulty walking without crutches.  He admitted that the diagnosis for fibromyalgia is dependent upon the patient's indications of pain when different "trigger spots" are touched.  He stated there was no objective or positive test, such as a blood test or x-ray, to verify fibromyalgia.  He stated that his diagnosis would be affected if a patient lied about the pain.  His belief that the plaintiff's pain resulted from the automobile accident was based upon the fact that the plaintiff told him so as well as the fact that she told him she had not experienced any pain prior to the accident.  He admitted that he did not treat the patient immediately after the accident and did not know whether she was disabled immediately after that accident.

Doctor James A. Hill, a board-certified orthopedic surgeon, testified that he first saw the plaintiff on May 28, 1992.  Doctor Hill took a medical history of the plaintiff and was told that she was experiencing problems localized to her knees and neck which began after a motor vehicle accident on November 30, 1989.  Hill also performed a physical examination of the plaintiff, determined she had bilateral chondromalacia, a roughness of cartilage underneath the kneecap, and suggested arthroscopic surgery.  Hill performed the arthroscopic surgery on plaintiff's left knee on September 29, 1992 and during that surgery found synovitis, inflammation of the left knee lining.  In Hill's opinion, the synovitis and chondromalacia are permanent conditions caused by trauma to the knee in the automobile collision in November 1989.  Hill opined that the plaintiff suffers, to a lesser degree, from synovitis and chondromalacia in the right knee; these conditions are permanent; and they cause pain to the plaintiff.  Hill also opined that the plaintiff was not a malingerer and that the signs, symptoms and conditions she exhibited were not made up.

On cross-examination, Hill stated that his opinion as to the cause of the plaintiff's knee problems was based on the fact that the plaintiff told him that those problems were caused by the automobile collision.  He admitted that his objective findings with respect to his first physical examination of the plaintiff were normal:  she had full range of motion in both legs and knees; there was no swelling in either knee; and there were no visual signs of injury to the knees.  The only abnormal finding resulted from the plaintiff's expression of pain when her knees were touched.  Hill stated that it normally takes three weeks to recover from arthroscopic surgery and that crutches are only used for two to three weeks thereafter.  He admitted that the plaintiff used crutches for three years after the surgery and stated that he had never seen nor heard of any other patient who needed crutches for one, two or three years after surgery.  He also admitted that he had never had a patient nor heard of a patient who claimed the extent of disability that the plaintiff claimed following arthroscopic surgery.  Hill admitted that conditions of chondromalacia and synovitis can be caused by recreational tennis, congenital alignment problems, and weak leg muscles.  He also stated that the plaintiff had weakness in her leg muscles when she first visited him.  Hill referred to a report from a physical therapist who described a lack of progress with the plaintiff.  The therapist also indicated that her attempts to apply patella tape to plaintiff's knee to aid her in exercising were unsuccessful but that the plaintiff would apply that tape, in a manner that the therapist felt was not forceful, and was then able to exercise.  Hill stated that he found that incident unusual.

Lynn Robinson, a physical therapist, testified that the plaintiff was referred to her in March 1991 by Doctor Sweeney for the care of her knees.  Robinson began therapy on the plaintiff's neck and back in April 1991 after the plaintiff began treatment with Doctor McMahon.  Robinson testified concerning her assessments of the plaintiff and the therapy that was rendered to the plaintiff.  Robinson ceased working with the plaintiff on June 6, 1991 because of plaintiff's lack of progress, because the plaintiff was experiencing pain during therapy and because of plaintiff's pregnancy.  She also testified that on June 4, 1991 the plaintiff complained of pain in all directions in her upper body while doing "motions" but that minutes later Robinson observed the plaintiff tending to her son and moving her arms and neck in several different positions without complaining of pain or making facial grimaces.

In defense, Doctor Neal Mahoney, a clinical psychologist, testified that he saw the plaintiff between February and May 1994 pursuant to a referral by Doctor Robert Hozman.  Mahoney ordered a Minnesota Multi-Faceted Personal Inventory II Test (MMPI), a personality test, which was performed on the plaintiff on February 14, 1994.  Doctor Mahoney testified that the profile that resulted from the test and his clinical evaluation of the plaintiff showed the plaintiff to be passive, dependent and demanding.  It also showed that she may attempt to control others by complaining of physical symptoms.  The report suggested that the plaintiff required an excessive amount of emotional support and that she may use physical complaints to gain attention.  Mahoney stated that individuals with this profile typically show a neurotic pattern of adjustment and respond to placebos or mild suggestion.  He stated that the report confirmed his concern that the plaintiff's financial interest was at least a secondary gain issue.  On cross-examination, Doctor Mahoney opined that the plaintiff's fibromyalgia was "triggered" by the accident of November 30, 1989.  He stated that that opinion was based on information gathered in taking plaintiff's history and her statement that she did not have any problems prior to the accident.

David Carey, a physical therapist, testified that he first saw the plaintiff on February 5, 1990.  Based upon his evaluation of her, he diagnosed cervical and upper back strain.  He stated that the plaintiff did not complain of knee soreness until June 11, 1990 when she indicated that she had played five games of tennis on the previous day.  On June 15 the plaintiff again expressed a complaint of knee soreness and indicated that she had been on her feet most of the previous day.  On June 19 the plaintiff complained of soreness in her knee after having danced at a wedding three days earlier.  On July 2, 1990 the plaintiff indicated that she had more right knee soreness after playing several games of tennis the previous day.  On July 6, 1990 the plaintiff told Carey that she was playing tennis two times per week and noted some knee soreness afterwards more in her right knee than her left knee.

Carey testified that he wrote a letter to Doctor Robert McMillan which noted inconsistencies in the plaintiff's actions.  Carey stated that he had observed the plaintiff squat down to help her son without assistance but could not balance herself using her hand on a nearby table when doing a two-legged squat.  Carey's letter further stated:

"'while attempting to test left knee strength, patient initially could not extend knee due to complaint of knee soreness and weakness.  When just the therapist's hand was placed on the distal tibia with no resistance given and patient was asked to extend the left knee, she still could not do it, even though she had actively extended the left knee fully just a few minutes earlier.  After strength test was successfully attempted on the right knee, she was able to fully extend the left knee against moderate manual resistance.'"

Carey also noted that when riding the stationary bike the plaintiff first noted some knee soreness but then was able to ride without resistance or complaint for ten minutes while simultaneously watching television and conversing with the therapist.

Julie Forster-Hauschild testified that she met the plaintiff in April 1993 when she and her husband were engaged by the plaintiff to perform interior renovation on the plaintiff's homes.  She stated that the plaintiff first took them through her residence, a multi-level home.  The plaintiff was not using crutches or wearing a neck brace and had no problems moving around or walking up and down the stairs.  On their second visit, the Hauschilds and the plaintiff again went through the house, up and down stairs.  The plaintiff had no problems moving, did not need assistance, did not limp, did not use crutches or a neck brace and was not in any obvious distress.  On the third occasion, the Hauschilds met the plaintiff outside her second home.  The plaintiff was carrying crutches; she had them tucked under her arm and was dragging them on one side.  Inside the home, which was one-story, the plaintiff did not use the crutches and proceeded to go through the house without any trouble.  Forster-Hauschild also detailed several incidents in which she observed the difference in the plaintiff's behavior when she was inside her homes and when she was in public.  During one such incident, the plaintiff appeared to have no physical difficulty inside her home but a short time later, while in a parking lot, the plaintiff wore the neck brace and used crutches.  Forster-Hauschild testified to a discussion she had with the plaintiff in August 1993 wherein the plaintiff discussed the automobile collision.  She stated that the plaintiff told her that she wouldn't settle for under a certain dollar amount and that she was "going to take this guy."  The plaintiff also told her that a doctor believed there was nothing wrong with her but that she found "some fiberal-myalgia, or something to that effect" in some medical books in the library and thought that was what she had.   The plaintiff also told her that that condition could not be traced.

Alan Hauschild reiterated the testimony given by his wife, Julie Forster-Hauschild.  He stated that when he and his wife first met with the plaintiff she was not using crutches or a neck brace and did not exhibit any problems while walking or bending.  He stated that plaintiff used crutches when outside of her house but walked normally inside of her house.  He also saw the plaintiff play on the floor with her children and pick her son up over her head.  Hauschild noted that on one occasion, when a roofer came to the plaintiff's home, she initially had crutches with her but climbed up on a ladder and went to the top of the roof to inspect it.  Hauschild testified that he overheard the plaintiff tell his wife that she was going to take an old man "down the line."  He also heard the plaintiff state that she had just come from the library where she was doing research concerning "fibromyo-something."  The plaintiff told them that the doctors said there was nothing wrong with her and that that was what she thought she had.

At the conclusion of trial, the jury returned a verdict in favor of the defendant; and judgment was entered on that verdict.  The trial court denied the plaintiff's post-trial motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.

ANALYSIS

I.  Jury Verdict

On appeal, the plaintiff first argues that she was entitled to judgment notwithstanding the verdict or a new trial because the overwhelming weight of the evidence established that the defendant's admitted negligence was the proximate cause of plaintiff's injuries.

It is axiomatic that judgments notwithstanding the verdict should be entered only in those cases in which all the evidence, when viewed in the aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand.  
Pedrick v. Peoria & Eastern R.R. Co.
, 37 Ill. 2d 494, 229 N.E.2d 504 (1967); 
Adams v. Sussman & Hertzberg, Ltd.
, 292 Ill. App. 3d 30, 684 N.E.2d 935 (1997).  Here, the evidence viewed in its aspect most favorable to the defendant does not favor the plaintiff such that it could be said that no contrary verdict could ever stand.  The plaintiff apparently concedes this conclusion since her argument on this point consists only of a statement that she moved for judgment notwithstanding the verdict; that the trial court denied the motion; and that she "suggests" that the evidence before the court mandates this relief.

As to plaintiff's assertion that she is entitled to a new trial, we note that a motion for a new trial should be granted only when the jury verdict is contrary to the manifest weight of the evidence.  
E.g.
, 
Maple v. Gustafson
, 151 Ill. 2d 445, 603 N.E.2d 508 (1992); 
Mizowek v. De Franco
, 64 Ill. 2d 303, 356 N.E.2d 32 (1976).  A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based on the evidence.  
E.g.
, 
Taluzek v. Illinois Central Gulf R.R.
, 255 Ill. App. 3d 72, 626 N.E.2d 1367 (1993); 
Anderson v. Beers
, 74 Ill. App. 3d 619, 393 N.E.2d 552 (1979).  As stated in 
Kim v. Evanston Hospital
, 240 Ill. App. 3d 881, 893, 608 N.E.2d 371, 379 (1992), "[t]he question is not whether the evidence 
could
 
have
 supported a verdict for the movant, but rather whether a contrary verdict is clearly evident."  (Emphasis original.)  In ruling on a motion for a new trial, neither the trial judge nor the reviewing court "'should sit as a second jury to consider the nuances of the evidence or the demeanor and credibility of the witnesses.'"  
Netzel v. United Parcel Service, Inc.
, 181 Ill. App. 3d 808, 813, 537 N.E.2d 1348, 1350 (1989), quoting 
Kitsch v. Goode
, 48 Ill. App. 3d 260, 271, 362 N.E.2d 445, 454 (1977).  A motion for a new trial is addressed to the sound discretion of the circuit court, and the court's ruling on that motion will not be disturbed absent abuse of discretion.  
Taluzek
, 255 Ill. App. 3d 72, 626 N.E.2d 1367.

In the instant case, the plaintiff argues that she is entitled to a new trial because the evidence at trial overwhelmingly established that the defendant's admitted negligence was a proxi
mate cause of her injuries.  In support of this argument, she cites to the testimony of her treating physicians, Doctors Hill, McMahon and Hozman, and to the testimony of Doctor Baskin, a chiropractor, who each opined that the plaintiff suffered from various medical conditions, that the plaintiff experienced pain as a result of these medical conditions, and that the medical conditions were caused by the automobile collision on November 30, 1989.  The plaintiff argues that this testimony stood uncontradicted since the defendant offered no competent medical evidence to defeat plaintiff's proof of causation.  She further argues that the defendant's own witness, Doctor Mahoney, a clinical psychologist, established causation when he admitted that nothing in the MMPI test administered to the plaintiff indicated that the automobile collision did not play a role in causing plaintiff's fibromyalgia and when he opined that plaintiff's fibromyalgia was "triggered" by the accident of November 30, 1989.

Contrary to the plaintiff's contentions, a defendant is not required to present medical testimony to discredit the testimony of the plaintiff's witnesses.  A verdict in favor of a defendant can be sustained, as in the instant case, where the defendant successfully discredits the testimony of plaintiff's witnesses.  Here, during cross-examination, each of the plaintiff's physicians and health care professionals admitted that their opinions that the plaintiff's medical conditions were caused by the automobile collision were based upon information given to them by the plaintiff.  They also admitted that their diagnoses were based upon the plaintiff's subjective expression of pain.

In forming their opinions, medical professionals can reasonably rely upon information made known to them by their patients, by medical records or by any other data where that information is of a type that is reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.  See 
Wilson v. Clark
, 84 Ill. 2d 186, 417 N.E.2d 1322 (1981) (non-treating physician's reliance on inadmissible medical records); 
People v. Ward
, 61 Ill. 2d 559, 338 N.E.2d 171 (1975) (treating physician's reliance on medical records).  It is reasonable for a medical professional to rely upon information supplied by the patient.  However, the medical professional's determination of the patient's credibility and acceptance of the patient's history and subjective expressions of pain, for purposes of making a medical diagnosis and rendering medical treatment, is not binding on the jury.  The jury, which is empowered to make credibility determinations (
e.g.
, 
Netzel
, 181 Ill. App. 3d 808, 537 N.E.2d 1348), must make its own assessment of the patient's veracity, not merely with respect to that person's in-court testimony but also with respect to that person's general credibility to the extent that person's credibility is relevant to the ultimate determination in the case.  See 
Melecosky v. McCarthy Brothers Co.
, 115 Ill. 2d 209, 216-17, 503 N.E.2d 355, 358 (1986) (jury must decide weight to be given opinion of medical expert that is based upon patient's subjective statements to expert); 
Aguinaga v. City of Chicago
, 243 Ill. App. 3d 552, 562, 611 N.E.2d 1296, 1305 (1993) (expert's testimony is but the opinion of the witness given on facts assumed to be true; it is the function of the trier of fact to determine the facts).  If the jury finds the patient to be incredible, it can correspondingly disregard the opinions of the medical professionals which are based upon information supplied to them by the patient.

Here, the key credibility determination for the jury to make concerned the credibility of the plaintiff both as to what she testified to at trial and as to what she said to the medical and health care professionals.  The defendant presented significant and substantial evidence to discredit the plaintiff's contention that she suffered from various medical conditions and that those conditions were caused by the automobile collision on November 30, 1989.  Defendant's cross-examination of the plaintiff showed that two days after the collision, the plaintiff vacationed in Disney World; that she spent time in Galena and may have gone horseback riding prior to her first physical therapy appointment with David Carey; and that she did not consult any medical professional from December 2, 1989 until February 4, 1990.  Although the plaintiff denied that she played several games of tennis in June and July 1990, the defendant presented testimony from David Carey, plaintiff's first physical therapist, who contradicted the plaintiff and testified that she told him she had played several games of tennis in June and July 1990 and had danced at a wedding in June 1990.  Carey also related incidents showing that the plaintiff inconsistently expressed pain in making certain movements but later was observed making similar movements without any indication of pain.  Similar observations were recounted by plaintiff's witness, Lynn Robinson, another physical therapist.  Alan Hauschild and Julie Forster-Hauschild, defense witnesses, testified that the plaintiff used crutches or wore a neck brace while in public but in the privacy of her home moved freely, went up and down stairs, and played with her children, lifting her son up over her head.  Alan Hauschild testified that on one occasion the plaintiff climbed up onto the roof of her house.  This testimony contradicted the testimony of Doctor Baskin who in testifying about the plaintiff's physical condition during the same time period stated that the plaintiff could not move two inches without support.

Finally, defendant's witness, Doctor Mahoney, testified that the MMPI profile showed the plaintiff to be passive, dependent and demanding and that she may attempt to control others by complaining of physical symptoms.  He stated that the MMPI report and his clinical evaluation of the plaintiff suggested that she required an excessive amount of emotional support and that she may use physical complaints to gain attention.  According to Mahoney, individuals with this profile typically show a neurotic pattern of adjustment and respond to placebos or mild suggestion.  He stated that the report confirmed his concern that the plaintiff's financial interest was at least a secondary gain issue.  This testimony corroborated the testimony of Hauschild and Forster-Hauschild that the plaintiff went to the library to learn about fibromyalgia to disprove the doctors' belief that there was nothing wrong with her and to help her recover in her lawsuit.

We note our independent concern regarding the admissibility of psychological tests that implicate the believability of a witness.  Courts have not been universally hospitable to such evidence both on the basis of reliability and on the basis that such evidence usurps the function of the jury.  See 
People v. Bobo
, 278 Ill. App. 3d 130, 662 N.E.2d 623 (1996) (finding error where witness allowed to refer to statistical report regarding the veracity of child sexual abuse victims; testimony invaded province of jury to make credibility determination of victim).  See also 
People v. Gard
, 158 Ill. 2d 191, 632 N.E.2d 1026 (1994) (finding evidence of polygraph examination inadmissible because unreliable); 
People v. Szabo
, 94 Ill. 2d 327, 447 N.E.2d 193 (1983) (polygraph results usurp the function of the jury due to risk that jury will find results conclusive).  See generally Charles L. Convis, 
Testifying About Testimony:  Psychological Evidence on Perceptual & Memory Factors Affecting the Credibility of Testimony
, 21 Duq. L. Rev. 579 (1983); Annotation, 
Physiological or Psychological Truth & Deception Tests
, 23 A.L.R. 2d 1306 (1952).  However, the plaintiff did not object to that aspect of Doctor Mahoney's testimony at trial, post-trial nor in her appellant's brief.  While an objection was interposed at trial, it was not as to the admissibility of Mahoney's testimony concerning the results of the MMPI test but, as shall be more fully discussed below, only as to the form and manner in which the results were elicited.  Accordingly, any issue regarding the admissibility of such evidence with respect to the concern expressed herein has been waived.  
In re Marriage of Kerman
, 253 Ill. App. 3d 492, 624 N.E.2d 870 (1993) (points not argued in appellant's brief are waived); 
Kim v. Evanston Hospital
, 240 Ill. App. 3d 881, 608 N.E.2d 366 (1992) (error is waived if not objected to at trial and not raised in post-trial motion).

Given the extensive evidence that bore directly on the issue of the plaintiff's credibility, we cannot say that it was inconceivable or unreasonable for the jury to find the plaintiff incredible not only with respect to her testimony at trial but also with respect to her relation of her medical conditions to the automobile collision and with respect to her complaints of pain to her treating physicians and health care providers.  In that regard, if the jury did not believe the plaintiff, then it  was free to disregard the opinions of the medical and health care professionals since those opinions were based upon information provided to them by the plaintiff.  As noted above, it is not for this court "'to sit as a second jury to consider the nuances of the evidence or the demeanor and credibility of the witnesses.'"  
Netzel
, 181 Ill. App. 3d at 813, 537 N.E.2d at 1350, quoting 
Kitsch v. Goode
, 48 Ill. App. 3d 260, 271, 362 N.E.2d 445, 454 (1977).  While it is possible that the jury made no award to the plaintiff to punish her for what they perceived to be a lack of candor, we may not accept that possibility when there is evidence in the record to support a legitimate basis for the jury's verdict.  
Maple v. Gustafson
, 151 Ill. 2d 445, 603 N.E.2d 508 (1992); 
Brendel v. Hustava
, 97 Ill. App. 2d 792, 800, 423 N.E.2d 503, 509 (1981), quoting 
Kitsch v. Goode
, 48 Ill. App. 3d 260, 271, 362 N.E.2d 446, 454 (1977) (where there is evidence to support the jury's verdict, it is an abuse of discretion to grant a new trial).  Although the plaintiff introduced evidence to support a verdict in her favor, we cannot say that such a verdict is clearly evident (
Kim
, 240 Ill. App. 3d at 893, 608 N.E.2d at 379) or that the verdict rendered by the jury in favor of the defendant was unreasonable, arbitrary or not based on the evidence.  
Taluzek
, 255 Ill. App. 3d 72, 626 N.E.2d 1367; 
Anderson
, 74 Ill. App. 3d 619, 393 N.E.2d 552.  Thus, the trial court did not abuse its discretion in denying plaintiff's motion for a new trial.
(footnote: 1)
II.  Evidentiary Admissions

The plaintiff next argues that she is entitled to a new trial because the trial court improperly allowed the Hauschilds to testify concerning a conversation they had with the plaintiff while disallowing the admission of a letter written by the plaintiff to show bias by the Hauschilds; allowed defendant to use records to refresh the recollection of a witness; allowed defendant to question the plaintiff in violation of the Dead Man's Act (735 ILCS 5/8-201 (West 1996)); and allowed an expert witness to testify without the proper foundation.

Plaintiff's first argument concerns the admission of testimony from Alan Hauschild and Julie Forster-Hauschild regarding a conversation between Forster-Hauschild and the plaintiff wherein the plaintiff mentioned an "older" gentleman and stated she going to "take this guy" and would not settle for under a specific dollar amount.  The Hauschilds also testified that during that same conversation the plaintiff stated that she had done some research at the library on "fibromyo-something" and that she thought that was her problem despite the fact that the doctors told her there was nothing wrong with her.

The plaintiff raises several objections to this testimony.  She contends that defendant's age was irrelevant and served only to invoke sympathy or inflame the jury.  She contends that the statement "to take this guy" was not an admission but only evidence of intention to exercise one's legal rights and should not have been admitted because the prejudice resulting from that statement far outweighed any probative value that it may have had.  Finally, she contends that the statement regarding the library should not have been admitted because Forster-Hauschild's recollection of the conversation was vague and contradicted by three of the plaintiff's experts who testified that the plaintiff suffered from fibromyalgia.  We disagree.  The statements made by the plaintiff to the Hauschilds were admissible as admissions of a party.  
Gillson v. Gulf, Mobile & Ohio R.R. Co.
, 42 Ill. 2d 193, 246 N.E.2d 269 (1969); 
Bafia v. City International Trucks, Inc.
, 258 Ill. App. 3d 4, 629 N.e.2d 666 (1994).  While statements of a party are not subject to hearsay restrictions, they are subject to relevancy restrictions and when relevant to issues in the case are admissible as substantive evidence of the truth of the statements made or of the existence of any facts which they have a tendency to establish.  
Cardiel v. Warren
, 191 Ill. App. 3d 816, 548 N.E.2d 1081 (1989).  When such a statement can be construed in more than one way, it is for the jury and not the trial court to make that construction.  
E.g.
, 
Pyskaty v. Oyama
, 266 Ill. App. 3d 801, 641 N.E.2d 552 (1994); 
People v. Cunningham
, 265 Ill. App. 3d 3, 637 N.E.2d 1247 (1994) (when facts give rise to more than one inference, it is for the jury to draw reasonable inferences).  Here, the statements made by the plaintiff could be construed as statements of intent to prove the doing of an act intended.  
People v. Howell
, 53 Ill. App. 3d 465, 368 N.E.2d 689 (1977).  See generally M. Graham, Cleary & Graham's Handbook of Illinois Evidence §802.1 (6th ed. 1994) (hereinafter referred to as M. Graham, Illinois Evidence).  With respect to plaintiff's characterization of Forster-Hauschild's testimony as vague, we find that assertion to be unsubstantiated by the record.  Moreover, even if that testimony was partially contradicted by testimony from plaintiff's experts, that factor would affect the weight to be given Forster-Hauschild's testimony not its admissibility.

Next, the plaintiff argues that the trial court improperly refused to allow into evidence a letter written by her to Julie and Allen Hauschild in which she discussed the Hauschilds' threat to testify against her in an unrelated lawsuit.  The plaintiff argues that the letter was relevant to show bias by the Hauschilds and could have been authenticated by the plaintiff.  Initially we note that the letter does not appear to have been included in the record on appeal.  The plaintiff's brief contains no citation to it nor has our review of the record led to its disclosure.  It is a basic principle of appellate practice that a party who prosecutes an appeal has the duty of presenting to the court of review everything necessary to decide the issues on appeal.  
Village of Lakemoor v. First Bank of Oak Park
, 136 Ill. App. 3d 35, 482 N.E.2d 1014 (1985).  Where the record does not show all the evidence on which the trial court based its decision, it will be presumed that the evidence omitted would have supported the decision of the trial court.  
Brandel Realty Co. v. Olson
, 159 Ill. App. 3d 230, 512 N.E.2d 85 (1987); 
Village of Lakemoor
, 136 Ill. App. 3d 35, 482 N.E.2d 1014.

Even assuming, as the plaintiff asserts, that the letter written by the plaintiff discussed the Hauschilds' threat to testify against her, we would agree with the trial court's conclusion that it was inadmissible.  The letter was written evidence of an out-of-court statement offered to show to truth of the matter asserted therein and as such was inadmissible hearsay.  See, 
e.g.
, 
People v. Rogers
, 81 Ill. 2d 571, 411 N.E.2d 223 (1980).  See generally M. Graham, Illinois Evidence §801.1.  The fact that the plaintiff, the declarant, was present in court and could have authenticated the letter is irrelevant to the determination as to whether the out-of-court statement is hearsay.  See 
People v. Lawler
, 142 Ill. 2d 548, 568 N.E.2d 895 (1991).  See also 
People v. Spicer
, 79 Ill. 2d 173, 179-82, 402 N.E.2d 169, 172-74 (1979) (what a witness has stated out-of-court and out of the presence of the defendant is pure hearsay and incompetent as substantive evidence)
(footnote: 2).  See generally M. Graham, Illinois Evidence §801.1, at 634-35.  Moreover, it would appear that the letter was double hearsay in that it discussed the alleged out-of-court statement of the Hauschilds in which they threatened to testify against Moran in another lawsuit.  As the plaintiff has not established that either statement falls within an exception to the hearsay rule, the letter was properly excluded.  See generally M. Graham, Illinois Evidence §805.1 (where double hearsay exists, each level of hearsay must fall within an exception to the hearsay rule).  Finally, in any event, whatever prejudice suffered is mitigated by the fact that the plaintiff was permitted to testify that Alan Hauschild threatened to "make up stories to hurt [plaintiff's] case."

Next, the plaintiff contends that the trial court erred in denying her objection and allowing the defendant to impeach her using unidentified hospital records from the emergency room of Evanston Hospital and physical therapy records of David Carey under the guise of refreshing her recollection.  We find no merit to these contentions.  A party may refresh the recollection of a witness by showing a document prepared by a third party to the witness.  The document need not be authenticated or admitted into evidence when it is used for that purpose.  
Merlo by Merlo v. Panisi
, 255 Ill. App. 3d 53, 59-60, 627 N.E.2d 309, 314 (1993); 
People v. Nickson
, 58 Ill. App. 3d 470, 374 N.E.2d 804 (1978).  See generally M. Graham, Illinois Evidence §612.1.  Here, the Evanston Hospital records were not admitted into evidence but were used on defendant's cross-examination of the plaintiff to refresh her recollection.  Plaintiff indicated that the document did refresh her recollection "a little bit."  The defendant did not mention the contents of those records, and no further reference was made to them.  Similarly, the records of David Carey were presented to the plaintiff to refresh her recollection.  Her recollection was not refreshed, and no further reference was made to them during plaintiff's cross-examination.  (The contents of those documents were disclosed to the jury, however, through the subsequent testimony of David Carey.)  Thus, we see nothing improper with defendant's reference to the hospital records and physical therapist's reports.

As a further contention of trial error, the plaintiff argues that the trial court erred in allowing the defendant to ask the plaintiff whether the automobile collision occurred on a road where the speed limit was thirty miles per hour.  The plaintiff states, without argument, that the question violated the Dead Man's Act (735 ILCS 5/8-201 (West 1996)).  First, we note that the plaintiff has waived this argument by failing to cite to pertinent authority.  See 155 Ill. 2d R. 341(e);
 
Vernon Hills III Limited Partnership v. St. Paul Fire & Marine Insurance Co.
, 287 Ill. App. 3d 303, 678 N.E.2d 374 (1997); 
Bank of Illinois v. Thweatt
, 258 Ill. App. 3d 349, 630 N.E.2d 121 (1994).  Moreover, even if we were to reach this issue, we see no error.  The Dead Man's Act provides that when a deceased is a party to a lawsuit, no adverse or interested party may testify on his or her behalf to any conversation with the deceased person or to any event which took place in the presence of the deceased.  735 ILCS 5/8-201 (West 1996).  In rejecting plaintiff's contention, we first note that she had no standing to raise the Dead Man's Act.  Objections based upon the Dead Man's Act are properly brought by the representative of the estate, not the adverse party.  See 
Popham v. Taff (In re Estate of Sewart)
, 274 Ill. App. 3d 298, 652 N.E.2d 1151 (1995).  The purpose of the Dead Man's Act is "to protect decedents' estates from depletion based on perjured testimony since it was considered that a party would be prone to testify falsely when such testimony cannot be directly contradicted."  
Fleming v. Fleming
, 85 Ill. App. 3d 532, 538, 406 N.E.2d 879, 883 (1980).  Second, the adverse party can waive the protections of the Dead Man's Act and elicit information prohibited by the Act.  
Popham
, 274 Ill. App. 3d 298, 652 N.E.2d 1151.  Here, as the deceased's representative asked the question, it could be argued that a waiver occurred.  Finally, we note that the question posed to the plaintiff did not fall within the substantive requirements of the Act.  A question eliciting the speed limit on the street where the automobile collision occurred does concern an event that took place in the presence of the deceased.  It concerned a fact that existed independent of the collision.  While the speed of the decedent's vehicle at the time of the collision would relate to the collision event, the posted speed limit did not.  See 
Rerack v. Lally
, 241 Ill. App. 3d 692, 695, 609 N.E.2d 727, 730 (1992) (the purpose of the Dead Man's Act is to bar only that evidence which the decedent could have refuted).

As her last contention on appeal, the plaintiff argues that the trial court improperly allowed the defendant to question Doctor Mahoney regarding the random findings of the MMPI test.  The plaintiff argued at trial and on appeal that Mahoney's testimony was improper because he merely recited computer-generated scores without making any clinical correlation.  In rejecting this contention, we first note that the plaintiff has cited no authority in support of her argument and thus has waived it for purposes of appeal.  See 155 Ill. 2d R. 341(e); 
Vernon Hills III Limited Partnership
, 287 Ill. App. 3d 303, 678 N.E.2d 374; 
Bank of Illinois
, 258 Ill. App. 3d 349, 630 N.E.2d 121.  Moreover, notwithstanding waiver, we would reject plaintiff's argument on its merits.  The record shows that the plaintiff, on cross-examination of Doctor Mahoney, elicited from him testimony that the computer-generated report should not be read alone in its raw form.  He stated that it had to be interpreted by a clinician working with the patient.  He further stated that he used and interpreted the report generated on the plaintiff as a clinician and that he used that report in conjunction with the history he had obtained from the plaintiff.  This testimony rendered plaintiff's objection baseless; and as there was no other objection made by the plaintiff to its admissibility, the trial court did not err in allowing that testimony into evidence.

For the foregoing reasons, the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

LEAVITT, P.J. and BURKE, J., concur.

FOOTNOTES
1:
In her reply brief, the plaintiff argues that the failure of the jury to award any compensatory damages is against the manifest weight of the evidence.  She contends that the jury should have awarded her the costs of x-rays taken in the emergency room at Evanston Hospital on the day of the automobile collision; x-rays taken one day later by Doctor Niedenthal; medications prescribed by Doctor Niedenthal; and her initial visits to Doctor Niedenthal and David Carey.  We note that this issue has been waived by plaintiff's failure to raise it in her appellant's brief (
In re Marriage of Kerman
, 253 Ill. App. 3d 492, 624 N.E.2d 870 (1993) (points not argued in appellant's brief are waived and shall not be raised in the reply brief)); by plaintiff's failure to raise it in her post-trial motion (155 Ill. 2d R. 366(b)(2)(iii); 
Ryan v. Katz
, 234 Ill. App. 3d 536, 600 N.E.2d 1206 (1992); 
Hollembaek v. Dominick's Finer Foods, Inc.
, 137 Ill. App. 3d 773, 484 N.E.2d 1237 (1985)); and by plaintiff's failure to cite to pertinent authority (
e.g.
, 
Vernon Hills III Limited Partnership v. St. Paul Fire & Marine Insurance Co.
, 287 Ill. App. 3d 303, 678 N.E.2d 374 (1997); 
Eckiss v. McVaigh
, 261 Ill. App. 3d 778, 634 N.E.2d 476 (1994)).  Notwithstanding waiver, we would be inclined to reject plaintiff's argument on its merits.  Here, the failure of the jury to compensate the plaintiff for medical expenses incurred immediately after the automobile collision need not be attributed to the jury's disregard of evidence but, rather, could be attributed to the jury's findings that the plaintiff was totally incredible, that she feigned her injuries from the moment of the occurrence, and that any expenses for those alleged injuries were therefore not proximately related to the collision.  See 
Kumorek v. Moyers
, 203 Ill. App. 3d 908, 913, 561 N.E.2d 212, 215 (1990) (new trial on the issue of damages required when zero dollars awarded but where damages are 
clearly
 evident).  See also 
Maple v. Gustafson
, 151 Ill. 2d 445, 603 N.E.2d 508 (1992); 
Brendel v. Hustava
, 97 Ill. App. 3d 792, 800, 423 N.E.2d 503, 509 (1981), quoting 
Kitsch v. Goode
, 48 Ill. App. 3d 260, 271, 362 N.E.2d 446, 454 (1977) (where there is evidence to support the jury's verdict, it is an abuse of discretion to grant a new trial).

2:
This holding in 
People v. Spicer
, 79 Ill. 2d 173, 402 N.E.2d 169 (1979) was substantially eroded with respect to criminal cases by the subsequent enactment of section 115-10.1 of the Code of Civil Procedure of 1963 (725 ILCS 5/115-10.1 (West 1996)).  See 
People v. Young
, 170 Ill. App. 3d 969, 979, 524 N.E.2d 982, 988 (1988).  It remains viable, however, with respect to civil cases.  See generally M. Graham, Cleary & Graham's Handbook of Illinois Evidence §801.1, at 634-35 (6th ed. 1994).