MIYOSHI BATES, Plaintiff-Appellee, v. WILLIAM CHEVROLET/GEO, INC., Defendant-Appellant.

First District (6th Division)   No. 1—01—4088

Opinion filed January 17, 2003.

152

Burke, Warren, MacKay & Serritella, P.C., of Chicago (Ira M. Levin and Corrie E. Schafer, of counsel), for appellant.

Krohn & Moss, Ltd., of Chicago (Larry P. Smith, of counsel), for appellee.

PRESIDING JUSTICE O'BRIEN delivered the opinion of the court:

Plaintiff, Miyoshi Bates, filed a two-count complaint alleging that defendant engaged in common-law fraud and violated section 2C of the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/2C (West 2000)) in connection with plaintiff's purchase of a used automobile. A jury trial was conducted on the common-law fraud count, and the jury returned a verdict for plaintiff in the amount of $1,060 in compensatory damages and $7,500 in punitive damages. The parties then submitted written memoranda to the trial court concerning the Consumer Fraud Act claim. The trial court found in favor of plaintiff and awarded plaintiff $1,060 in compensatory damages and $17,500 in attorney fees. Defendant appeals, arguing that: (1) the trial court erred in denying its motion for a new trial/judgment notwithstanding the verdict on plaintiff's claim of common-law fraud; and (2) the trial court erred in ruling in favor of plaintiff on her Consumer Fraud Act claim. We affirm.

At trial, plaintiff testified that on July 10, 1999, she went to defendant's dealership to shop for an automobile. Plaintiff was approached by Richard Johnson, one of defendant's salespersons.

Plaintiff told Mr. Johnson that she wanted to buy a Kia Sportage, but that she only had $1,000 to put down, that her credit was bad, and that she did not want her monthly payments to exceed $350.

Mr. Johnson told plaintiff that he could not finance the Kia Sportage at $350 per month, but he told her that he could provide the requested financing for a Nissan Pathfinder. Plaintiff agreed to buy the Nissan Pathfinder.

Mr. Johnson walked her to the finance department, where she met with Ray Valone. Plaintiff told Mr. Valone that her credit was bad and that she was afraid financing would be difficult. Mr. Valone told plaintiff that her credit was "no problem" and that he would "shop around" and find plaintiff a "good deal."

Plaintiff told Mr. Valone that she could afford to pay, at the most, $350 per month. Mr. Valone told plaintiff that "he didn't see it being a problem."

Plaintiff testified that Mr. Valone then presented her with a retail installment contract. The contract set forth an annual percentage rate of 24.95% and monthly payments of $428.07. The contract did not state who would be financing the car.

Plaintiff testified as follows regarding her reaction to the contract:

"Q. Tell us who said what to whom when that document was put in front of you?

A. *** I looked at this, and I said, '24.95%? Oh, no.' I said, 'Ray, if I have to pay this percentage rate at this monthly installment, I might as well leave out of here right now.' He said, 'Oh, no, no.' He sat back and he said, 'Look, I'm not trying to do you in or anything. This is the worst case scenario.' He said, 'This is not what your payments is going to be.' He said, 'Your payments will not be this.'

And he proceeded to tell me about his wife and children. We had like a conversation because he wanted me to feel comfortable. So he said, 'No, this is not what it would be. I'm going to shop around.' And that's what he promised me to do. He said he was going to shop around and find the best rate and then he would call me and let me know what it would be.

Q. Did you say anything further after that?

A. After he told me that—oh, I asked him, I said, 'Is it possible that I can end up with this contract?' And he said, 'No.' He said, 'That's why I want you to sign the blank one because after I shop around, after I find the best rate possible, then I will have this contract that's already signed blank, and I will fill it in there.' But I refused to sign that, and so he said, 'You know what, you can sign this other sheet. This lets you know that if we don't get you financed, you can get your money back.'

Q. This other sheet, what are you referring to?

A. It was another sheet of paper that had on there William Chevrolet's emblem up top, and it was on their letterhead. It was a letter that they had written, and then my signature goes on the bottom.

Q. It's not a document that you have?

A. No.

Q. At some point, you agreed to sign [the retail installment contract]?

A. Right. I agreed because he told me—he said, 'Look, the only reason why you are signing this document is because you are taking our vehicle off the lot. You're taking it off the lot, and if you get stopped by the policeman or anything, you want to have proof that you actually purchased this vehicle.' And I said, 'I want to make sure that I'm not going to be paying this note. I can't afford it. I have four children.' He said, 'Look, Ms. Bates, I know you can't afford it. I have a wife and children myself. I'm not trying to stick you with this.' "

Plaintiff signed the retail installment contract and supplied a cashier's check for $1,000 and a personal check for $1,000 that the dealership was to hold until plaintiff received her next paycheck in two weeks' time. Plaintiff also provided a personal check for $60 "for an insurance binder." Plaintiff then drove the car off the lot.

Plaintiff subsequently received several letters from various financing companies, informing her that she had been denied financing. On July 11 or 12, plaintiff returned to defendant's dealership in order to find out if she had been financed.

Plaintiff met with a manager named Brian and told him that she wanted to speak with Mr. Valone. Brian told plaintiff that Mr. Valone was not in the office that day. Plaintiff then asked Brian to look at her file and tell her whether she had been financed. Brian looked at her file and told her that he believed she had been financed. However, Brian also told her that she needed to talk to Mr. Valone. Plaintiff then left the dealership.

Plaintiff returned to the dealership on July 14, accompanied by her pastor, Rayford Grady. They met with Mr. Valone in his office, and plaintiff asked him if she had been financed. Mr. Valone told her that she had been financed under the terms of the retail installment contract that she had previously signed.

Plaintiff reminded Mr. Valone that she could not afford the terms of the retail installment contract and that Mr. Valone had promised her that he would shop around and get her the best rate. Mr. Valone told plaintiff that he did not "remember saying that to [her]."

Mr. Valone told plaintiff that she had been financed by the Consumer Finance Corporation and that he had handwritten the name

of that finance company on the retail installment contract. Plaintiff asked to see the paperwork. Mr. Valone refused, so plaintiff grabbed it out of his hands.

Mr. Valone ran to get Brian, who yelled, "Shut down the dealership. Shut it down." They then shut the gates to the dealership, locked the doors, and threatened to call the police. Plaintiff asked for the return of her down payment; Brian refused, telling her that she would have to hire an attorney to get her money back.

Plaintiff testified she returned the paperwork and the Nissan Pathfinder and that she and Pastor Grady left the dealership.

Ray Valone testified that he was defendant's finance insurance manager in July 1999. Mr. Valone testified that he remembered meeting with plaintiff on July 10, but he did not recall her ever telling him that she could only afford car payments of $350 per month. Mr. Valone testified that he told plaintiff he would shop around and get her the best deal possible; however, he stated that he never told her he could get her financed at a rate considerably lower than 24.95%.

Mr. Valone testified he attempted to obtain financing for plaintiff, and he admitted that on July 12 he received a fax from Consumer Finance Corporation stating that it would finance plaintiff at $350 per month. Mr. Valone did not tell plaintiff about this offer, because plaintiff would have needed to put down another $3,000 to $4,000 in cash.

Mr. Valone testified that at 1:12 p.m. on July 14 he received another fax from Consumer Finance Corporation, offering plaintiff financing at $400 per month. Mr. Valone further testified:

"Q. A reason for this payment going up from $350 to $400 could be because you may have contacted them to report more income for the customer; isn't that true?

A. No, sir. I probably contacted the lender just to be able to keep her into this vehicle and try to get the young lady financed."

Mr. Valone was then impeached with his deposition testimony, in which he stated:

"Q. What would be the reason for them coming back two days later with a higher maximum payment?

A. More income from the customer there."

Mr. Valone further testified at trial that at 1:18 p.m. on July 14 he received another fax from the Consumer Finance Corporation:

"Q. Now that is a third transmission from the Consumer Finance Corporation regarding [plaintiff's] attempt *** to get financing; is that correct?

A. That is correct.

Q. And this is also on July 14, 1999; is that correct?

A. That's correct.

Q. This shows 1:18 p.m.; is that correct?

A. That's correct.

Q. So that's just six minutes later?

A. Yes, sir, that's correct.

Q. Now, it shows the maximum payment being $428.07; isn't that correct?

A. That's correct.

Q. Now, looking at *** the retail installment contract, the payment on that contract is for $428.07; isn't that true?

A. That is true.

Q. So now, the Consumer Finance Corporation, six minutes after the last transmission, sends you a transmission giving the maximum payment of exactly what's on the installment contract; is that true?

A. That's correct.

\* \* \*

Q. And the reason again that this happened, that the payments went up again, was that you contacted them and you told them that for [plaintiff] to be able to keep the car, she would have to pay that much?

A. No, sir.

Q. That's not true?

A. No, sir."

Mr. Valone was again impeached with his deposition testimony, in which he testified:

"Q. Do you recall anything going on that day between yourself and Consumer Finance that prompted a new disposition letter six minutes after the first?

A. I very possibly contacted them letting them know that in order to reach—in order to keep [plaintiff] in this vehicle, we would need $428.00 payments."

Mr. Valone further testified at trial that the higher the interest rate charged and the larger the amount financed, the greater his profits.

The jury returned a verdict in favor of plaintiff on her common-law fraud claims, finding that defendant had made false statements of material fact regarding its ability to secure financing for plaintiff on terms acceptable to her. The jury found that defendant knew the statements were false, that plaintiff relied upon defendant's statements when purchasing the Nissan, and that plaintiff was damaged thereby. The jury awarded her $1,060 in compensatory damages and $7,500 in punitive damages. The trial court denied defendant's motions for judgment notwithstanding the verdict and for a new trial.

The trial court returned a verdict in favor of plaintiff on her Consumer Fraud Act claim, finding that defendant rejected plaintiff's credit application when it failed to procure financing for her at the requested $350 per month. The court found that defendant's failure to return plaintiff's down payment after rejecting her credit application constituted a violation of section 2C of the Consumer Fraud Act.

Defendant filed this timely appeal from the orders: (1) denying its motion for judgment notwithstanding the verdict (judgment *n.o.v.*)/ new trial on the jury verdict in favor of plaintiff on the common-law fraud counts; and (2) the order finding in favor of plaintiff on the Consumer Fraud Act count.

First, defendant argues that the trial court erred in denying its motion for a judgment *n.o.v.*/new trial upon plaintiff's common-law fraud counts.

■ A motion for judgment notwithstanding the verdict should only be granted when all the evidence, viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict could ever stand based on that evidence. *Moran v. Erickson*, 297 Ill. App. 3d 342, 352 (1998). A motion for a new trial should only be granted when the verdict is against the manifest weight of the evidence. *Moran*, 297 Ill. App. 3d at 352. A court's ruling upon a motion for a new trial will only be disturbed if it constitutes an abuse of discretion. *Moran*, 297 Ill. App. 3d at 353.

■ First, defendant contends the trial court erred in denying its motions for a judgment *n.o.v.*/new trial and in support cites *Leon v. Max E. Miller & Son, Inc.*, 23 Ill. App. 3d 694 (1974). In *Leon*, the plaintiff brought a breach of contract action against the defendant, who admitted signing the contract without reading its terms. The trial court entered summary judgment in favor of the plaintiff. *Leon*, 23 Ill. App. 3d at 695. The appellate court affirmed the grant of summary judgment on plaintiff's complaint, holding that "[o]ne is under a duty to learn, or know, the contents of a written contract before he signs it, and is under a duty to determine the obligations which he undertakes by the execution of a written agreement." *Leon*, 23 Ill. App. 3d at 699.

In contrast to *Leon*, plaintiff here testified that she read the retail installment contract and informed Mr. Valone that the terms of the contract were unacceptable to her. Plaintiff's cause of action is not based upon her failure to determine the obligations undertaken by the execution of the written agreement. Rather, plaintiff's cause of action is based upon defendant's alleged fraudulent representations. Accordingly, *Leon* is inapposite.

Next, defendant contends that "plaintiff argued that there was no financing approval and therefore no valid contract. As such, the al-

leged misrepresentation as to financing terms is moot. To even state a claim, plaintiff at a minimum would have had to enter into a contract and claim that she did so based on the misrepresentation."

■ Defendant's argument is not well-taken. The elements of common-law fraud are: (1) false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance on the statement; and (5) plaintiff's damages resulting from reliance on the statement. *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill. App. 3d 642, 648 (2001).

■ Plaintiff presented evidence at trial that defendant deliberately misrepresented the financing terms to induce plaintiff to sign the contract and that plaintiff relied on the misrepresentations to her detriment. As such, plaintiff stated a claim for common-law fraud. The trial court did not err in denying defendant's motions for judgment *n.o.v.*/new trial.

Next, defendant argues that the trial court erred in denying its motion for judgment *n.o.v.*/new trial because plaintiff suffered no damages based upon the misrepresentations. We disagree, as plaintiff suffered damages in the amount of the down payment that was not refunded to her, as well as the attorney fees incurred in pursuit of her claim.

■ Next, defendant argues that the trial court erred in denying its motion for judgment *n.o.v.*/new trial because plaintiff's fraud claims rest on defendant's alleged *future* promise to find her a better interest rate than the one she contracted for in writing. Defendant cites *Metropolitan Bank & Trust Co. v. Oliver*, 4 Ill. App. 3d 975, 978 (1972), which held that for a statement to constitute fraud, the misrepresentation must be one of past or present fact.

Defendant's argument is not well-taken, as there was evidence at trial that defendant made various misrepresentations as to existing fact. Specifically, plaintiff testified that Mr. Valone falsely represented that the retail installment contract was not binding without specification of the financing company and that the signing of the contract was a formality to get the car off the lot and satisfy a police officer in the event of a stop. Plaintiff also testified to another misrepresentation of existing fact, specifically, Mr. Valone's statement to her that the sheet of paper with the William Chevrolet logo was a guarantee that plaintiff would not lose her deposit in the event of the unavailability of financing satisfactory to her. Plaintiff's testimony was sufficient to support her claim of fraud.

■ Next, defendant argues that the trial court erred in submitting the question of punitive damages to the jury. Whether punitive dam-

ages can be awarded for a particular cause of action is a matter of law, but the question of whether a defendant's conduct was sufficiently willful or wanton to justify imposing punitive damages is generally for the jury to decide. *Cirrincione v. Johnson*, 184 Ill. 2d 109, 116 (1998).

■ It is well settled that punitive damages may be awarded when torts are committed with "fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186 (1978). Punitive damages are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future. *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 414 (1990).

■ Punitive damages can properly be awarded against a master or other principal because of an act by an agent only if: the principal authorized the doing and the manner of the act, the agent was unfit and the principal was reckless in employing him, the agent was employed in a managerial capacity and was acting in the scope of his employment, or the principal or a managerial agent of the principal ratified or approved the act. *Kennan v. Checker Taxi Co.*, 250 Ill. App. 3d 155, 161 (1993).

■ Here, there was evidence that Mr. Valone, acting in his capacity as the defendant's finance insurance manager, presented plaintiff with a retail installment contract setting forth an interest rate of 24.95% and monthly payments of $428.07. Plaintiff initially refused to sign the contract and explained to Mr. Valone that she had four children and could only afford payments of no more than $350 per month. Mr. Valone explained that he understood plaintiff's situation, that the signing of the contract was a mere formality so that she could take the vehicle off the lot without being stopped by the police, and that he would shop around and get her the best rate. Mr. Valone assured her that she would not be making the $428.07 payments set forth in the contract, and that by signing the other sheet of paper with the William Chevrolet logo, she would be guaranteed of not losing her deposit in the event of the unavailability of financing satisfactory to her. Based upon these representations, plaintiff signed the contract and made her down payment of $1,060.

There was also evidence that instead of trying to secure financing for plaintiff at the promised rate of $350 per month, Mr. Valone actively sought to secure financing corresponding to the $428.07 figure set forth in the retail installment contract. After three attempts, Mr. Valone successfully secured the financing at $428.07. When plaintiff returned to the dealership and objected, she was refused the return of

her down payment, briefly locked inside the dealership, and told to get an attorney.

The foregoing evidence was sufficient to support a finding that defendant acted willfully or with such gross negligence as to indicate a wanton disregard of plaintiff's rights. Accordingly, the trial court did not err in submitting the question of punitive damages to the jury. Further, the jury's decision awarding punitive damages was not against the manifest weight of the evidence.

Next, defendant argues that the trial court erred in entering a verdict for plaintiff on her claim for damages pursuant to section 2C of the Consumer Fraud Act. The trial court's ruling following a bench trial will not be reversed unless it is against the manifest weight of the evidence. *Judgment Services Corp. v. Sullivan*, 321 Ill. App. 3d 151, 154 (2001).

Section 2C states:

"If the furnishing of merchandise, whether under purchase order or a contract of sale, is conditioned on the consumer's providing credit references or having a credit rating acceptable to the seller *and the seller rejects the credit application of that consumer,* the seller must return to the consumer any down payment, whether such down payment is in the form of money, goods, chattels or otherwise, made under that purchase order or contract and may not retain any part thereof." (Emphasis added.) 815 ILCS 505/2C (West 2000).

Defendant argues that it did not reject plaintiff's credit application and, thus, that section 2C is not applicable here. We disagree. Plaintiff testified that she made clear to Mr. Valone that her credit application was contingent upon defendant's finding financing for her at no more than $350 per month. Although Mr. Valone testified to the contrary, the trial court believed plaintiff's version of events and found that defendant rejected plaintiff's credit application when it failed to procure financing for her at the requested $350 per month. The court further found that defendant's failure to return plaintiff's down payment after rejecting her credit application constituted a violation of section 2C of the Consumer Fraud Act. The trial court's decision is supported by plaintiff's testimony; accordingly, we affirm the order awarding damages and attorney fees to plaintiff. 815 ILCS 505/10a(c) (West 2000) (providing that the trial court may award attorney fees to the prevailing party.)

Defendant contends that plaintiff's claim fails because defendant attempted to refund plaintiff's down payment prior to trial. In support, defendant cites *Hayman v. Autohaus on Edens, Inc.*, 315 Ill. App. 3d 1075 (2000), which held that when a named defendant has

unconditionally tendered the full amount owed to plaintiff prior to suit being filed, there remains no actual controversy and the suit is rendered moot.

Defendant claims that it made several attempts to refund plaintiff's down payment prior to trial, including sending the money to plaintiff by certified mail. However, the certified letter was returned unopened. Further, plaintiff testified that she never received a certified letter from defendant and that she was not aware that defendant had attempted to refund her money. The trial court believed plaintiff's version of events. We will not disturb that determination, as it is the province of the trier of fact to pass upon the credibility of the witnesses. *Cirrincione*, 184 Ill. 2d at 116.

Defendant also argues that it offered to return plaintiff's down payment to plaintiff's counsel prior to suit being filed, but that counsel perhaps failed to inform plaintiff of the offer. Defendant argues that since it tendered to plaintiff's counsel the "full amount" owed to plaintiff, there remained no actual controversy and the suit was rendered moot.

We disagree. Defendant failed to tender the attorney fees recoverable under section 10a(c) of the Consumer Fraud Act and, thus, failed to tender the "full amount" owed to plaintiff. Accordingly, plaintiff's cause of action was not moot.

For the foregoing reasons, we affirm the circuit court.

Affirmed.

GALLAGHER and O'MARA FROSSARD, JJ., concur.