*In re* K.R., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Caroline M., Respondent-Appellant).

Third District   No. 3—04—0674

Opinion filed April 19, 2005.

Julie M. Baldwin, of Henderson, for appellant.

Kevin W. Lyons, State's Attorney, of Peoria (Lawrence M. Bauer and Robert M. Hansen, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McDADE delivered the opinion of the court:

The State filed a juvenile petition for wardship alleging that three-month-old K.R. was abused by his father, Todd R., and neglected by his mother, respondent Caroline M. Following adjudicatory and dispositional hearings, the trial court allowed the petition and granted the Department of Children and Family Services (DCFS) guardianship with the right to place. Respondent appeals. She argues that (1) the finding of neglect was contrary to the manifest weight of the evidence, and (2) the dispositional order was an abuse of the trial court's discretion. We affirm.

## BACKGROUND

On December 12, 2003, the State filed its petition for wardship based on allegations that respondent's home was injurious to K.R.'s welfare, Todd broke K.R.'s leg, and hospital personnel found that K.R. had two broken ribs that could not have resulted absent abuse. The petition further alleged that Todd had a history of drug dealing and drug use, Todd was growing cannabis in the home, and both parents used cannabis.

The adjudicatory hearing was held on March 8 and June 28, 2004. Respondent's mother, Pam Bryan, was the State's first witness. She testified that she observed a greenish bruise on K.R.'s chest when he was about six weeks old. Respondent told Bryan that Todd may have grabbed the baby too hard. About a month later, Bryan observed a greenish discoloration on all of the nail beds on one of K.R.'s hands. Respondent told her the baby's fingers got smashed, but she did not know how. She said the dog may have stepped on them. Subsequently, on December 5, 2003, respondent telephoned Bryan to tell her that something was wrong with K.R. Bryan told respondent to take him to the hospital. She said she could hear Todd in the background, saying that the baby was not hurt that bad and they did not need to take him to the hospital.

Bryan further related that respondent had telephoned her on prior occasions, when Todd pushed her down the basement stairs while she was pregnant and when he "body slammed" her following tubal ligation. Bryan said that respondent subsequently told her that Todd had not pushed her down the stairs, but only pushed her against a door.

Respondent's sister, Anna Johnston, testified that she saw K.R. and respondent at the hospital on December 6, 2003. She said respondent asked her to stay with K.R. while she and Todd went home to clean up the marijuana and paraphernalia in the house. Before respondent and Todd could leave, the police arrived at the hospital and ordered them to return to K.R.'s room. Johnston subsequently overheard respondent ask a friend who was with her in K.R.'s room to remove the contraband from the house.

Peoria police detective Kerrie Davis testified that she interviewed respondent at the police station on the afternoon of December 6, 2003, after receiving a report from the hospital that K.R. had a "bucket handle" fracture of the left tibia. Respondent told her that Todd watched K.R. while she worked from 8 p.m. on December 4 until 3 or 4 a.m. the next morning. Respondent said K.R. was fine when she left for work, but Todd told her when she got home that K.R. had been unusually fussy that night. Later, when respondent changed K.R.'s diaper, he screamed. Respondent noticed that K.R.'s left leg was shiny, swollen and hot to the touch. Respondent asked Todd what had happened to the baby's leg, and he told her he had not noticed anything wrong. When respondent's ride arrived to take her to work, respondent asked him if he thought the baby should be taken to the hospital. He thought it was a good idea. Respondent then telephoned her mother, and her mother also said the baby should be taken to the hospital. Respondent said she told hospital personnel that K.R. did not roll over by himself, so she did not believe he had fallen. She opined that the dog was jealous of him. However, there were no bite marks to account for a bite infection. Respondent then suggested that Todd had "played a game" by pulling K.R.'s foot up to his mouth. She denied, however, that the baby had cried out as if the "game" hurt him.

Davis subsequently interviewed Todd. Todd related that K.R. had been unusually fussy the night of December 4-5. He could not be comforted and did not fall asleep until after midnight. Todd said he did not notice anything unusual about the baby's leg the next morning. He initially had no explanation for the broken bone. After Davis asked him to try to remember what might have caused the injury, Todd related the foot-to-mouth "game." Davis said she did not believe that the injury resulted from that activity, and she asked Todd to tell her the truth. Todd then said that he had twisted the baby's leg while

changing his diaper. Later, Todd changed his story and told Davis that he had tripped down some stairs while carrying K.R. on his shoulders. He said he grabbed one leg to keep K.R. from hitting the floor and "heard a loud pop."

Todd admitted to Davis that he was growing marijuana plants in the home. He said he had more marijuana in his bedroom and a bong in his closet. He gave Davis permission to remove the material from the home. Both Todd and respondent admitted to Davis that they occasionally smoked pot.

Respondent testified in the State's case. She denied that K.R. ever had a bruise on his chest, and she denied any knowledge of his broken ribs prior to receiving the hospital report. Respondent admitted making a statement to her mother that Todd may have grabbed K.R. too hard, but she attributed this to Todd being a "new daddy" unsure of how to keep the baby from slipping in the tub. Respondent also denied that Todd ever hit or pushed her when she was pregnant. Asked whether Todd "body slammed" her, respondent said that Todd had "picked [her] up and sat [her] on the couch" the day after tubal ligation surgery and that he was "somewhat" angry. Respondent said she observed the bruising on K.R.'s fingernails and asked Todd about the condition, but he denied knowing how that happened. She said that only "three and a half" fingernails were discolored, and she opined that the dog or her five- and seven-year-old children by her first husband may have been responsible.

On cross-examination, respondent admitted that Todd had other children, but she said K.R. was the first child he had lived with. She did not believe that Todd's caring for K.R. full-time was a problem.

The State's last witness was respondent's next-door neighbor, Michelle Rogers. Rogers testified that on five or six occasions, respondent had come over to use her telephone to call her mother when Todd had physically abused her. Rogers also witnessed Todd mistreating his dog when she did not obey Todd's command to go inside. She further related that Todd had picked up a lamp and thrown it at respondent when he came home one day to find that Rogers and her sister were visiting respondent. Rogers said the lamp did not hit respondent, but almost hit K.R. To keep the situation from escalating, Rogers and her sister left the house. Rogers did not telephone the police for fear of alienating respondent. When Rogers asked respondent why she did not leave Todd, respondent said she loved him.

The State also introduced (1) certified court documents of Todd's 1997 convictions of possession of drug paraphernalia and possession of cannabis with intent to deliver; (2) certified records of Todd's 2002 conviction of possession of drug paraphernalia; (3) police photographs

of potted marijuana plants found on the floor of a bedroom with a playpen in respondent's home on December 6, 2003; (4) photographs of a bong and a clay "hitter" pipe recovered from respondent's home on December 6, 2003; (5) police lab reports of January 22, 2004, showing that 2.7 grams of plant material removed from respondent's home tested positive for cannabis; and (6) hospital records establishing that K.R. had a recent fracture to his left tibia and healing fractures to two ribs when he was received at the hospital on December 5, 2003, and that medical personnel had determined that the fractures were most likely nonaccidental injuries.

At the close of the State's case, both sides rested. Following arguments of counsel, the court found K.R. abused and neglected and ordered respondent to cooperate with DCFS pending disposition, which was set by agreement for a hearing on August 2, 2004.

Respondent's caseworker, Lela Keyes, was the State's sole witness at the dispositional hearing. She stated that she was aware of an incident between respondent and Todd on June 21, 2004, resulting in a domestic battery police report and an injury to respondent's right wrist. Respondent told the police that she hurt herself by "punching the floor" during an argument and did not want to pursue charges against Todd. Keyes said Todd moved out of respondent's home for a few days but returned, and the couple were residing together at the time of the hearing. Keyes also testified that respondent had been cooperative with social services, although she had missed several required drug tests and one random drug drop tested positive for methamphetamine and another showed "dilute." Keyes' social history report to the court contained 14 recommended services for the parents, requested that DCFS be awarded guardianship of K.R. with the right to place and recommended that both parents be found fit.

Testifying on her own behalf, respondent denied that she had used methamphetamine. She stated that she "got distracted" and had "a bad attitude" when the drug test came back positive. As a consequence, she explained, she declined to give several random drops. Respondent further explained that the reason subsequent drug tests showed a diluted sample was that she was a very active person and drank a lot of water. On cross-examination, respondent admitted that she went to the hospital emergency room on June 21, 2004, because her ribs were hurt. She related the following:

> "Todd and I were in bed and he asked me to move away. Apparently, I didn't respect that, and he flipped me over once or twice in the ribs, and then I left for the rest of the night."

Asked for further explanation, respondent said, "He tapped me. He made contact with my ribs." Pressed further, respondent admitted

that Todd had punched her in the ribs. She had contusions and bruising; however, X rays revealed no fractures.

Following arguments of counsel, the court found respondent unfit to care for K.R., made K.R. a ward of the court and granted DCFS guardianship. The court specifically noted that, with respect to respondent, the evidence showed that K.R.'s best interest would be jeopardized if he were returned to her, because:

> "One, she was not able to control her own anger or manage her own ability to communicate, so she broke her own hand; and two, *** she continues, after she tells this court under oath that the incident was a wake-up call and that she separated from [Todd], under the circumstances to reunite with him approximately seven days later."

Accordingly, the court ordered respondent to (1) execute releases as requested by DCFS, (2) cooperate with DCFS and its designees, (3) obtain a drug and alcohol reassessment and complete any recommended treatment course, (4) perform random drug drops four times a month, (5) submit to a psychological evaluation and follow recommendations, (6) participate in counseling to address anger management and domestic violence issues, (7) complete a domestic violence course, (8) attend weekly Narcotics Anonymous or Alcoholics Anonymous meetings, and (9) attend scheduled visits with K.R.

## ISSUES AND ANALYSIS

### 1. Neglect

Respondent initially contends that the State failed to prove that she neglected the minor. We disagree.

■ A child may be found neglected if his environment is injurious to his welfare. 705 ILCS 405/2—3(1)(b) (West 2002). An "injurious environment" may be found where a parent has breached her duty to ensure a safe and nurturing shelter for the child. *In re N.B.*, 191 Ill. 2d 338, 730 N.E.2d 1086 (2000). In determining whether the State has proved an allegation of neglect by a preponderance of the evidence, the court must focus on the status of the child, not the acts or omissions of the parent. *In re Arthur H.*, 212 Ill. 2d 441, 819 N.E.2d 734 (2004). On review, this court will not disturb a trial court's finding of neglect unless it is contrary to the manifest weight of the evidence. *In re L.M.*, 319 Ill. App. 3d 865, 747 N.E.2d 440 (2001). A finding is contrary to the manifest weight of the evidence only where the opposite conclusion is clearly evident. *Arthur H.*, 212 Ill. 2d 441, 819 N.E.2d 734.

■ In this case, the court's adjudication of neglect was not against the manifest weight of the evidence. The State's evidence showed that

respondent tolerated, minimized or covered up her live-in boyfriend's abuse of herself and her child. Despite respondent's denials, the evidence established that Todd was a violent person and that respondent placed her child at risk by leaving him at home with Todd while she worked. It was not until Todd broke the minor's leg that respondent finally took him to the hospital. There, rather than focusing on the minor's condition, she concerned herself with cleaning up evidence of cannabis possession in the house. Even after learning that the minor had suffered three broken bones while in Todd's care, respondent came into court and said she did not consider Todd a problem.

Based on the evidence, the court was not required to await further proof of who or what was causing injuries to the minor before it found him neglected. See *Arthur H.*, 212 Ill. 2d 441, 819 N.E.2d 734. The evidence manifestly supports the conclusion that respondent's refusal to acknowledge that Todd posed a danger to herself and her child made her home an "injurious environment" to the minor's welfare.

## 2. Dispositional Order

■ Next, respondent argues that the court erroneously found her unfit to care for the minor. She contends that the court should have adopted her caseworker's recommendation that she be found fit. Again, we disagree.

In determining whether a neglected minor's parent is fit to care for the minor, the court must consider whether the "best interest of the minor will be jeopardized if the minor remains in the custody of his *** parent[ ]." 705 ILCS 405/2—27(1) (West 2002). "All evidence helpful" should be considered in reaching this decision. 705 ILCS 405/ 2—22(1) (West 2002). On appeal, a trial court's determination of unfitness will be reversed only if the finding is against the manifest weight of the evidence. *In re Lakita B.*, 297 Ill. App. 3d 985, 697 N.E.2d 830 (1998).

Here, evidence admitted at the dispositional hearing indicated that, even though respondent was cooperating with her caseworker, she persisted in tolerating Todd's violence toward her and minimizing the consequences. In addition, notwithstanding the excuses respondent gave the court for her partial compliance with drug drops, the court was justified in requiring her to obtain a reassessment to address drug dependency issues. It is apparent that, until respondent takes responsibility to eliminate drugs and domestic violence from her own life, she cannot provide a safe, nurturing environment for her son. Accordingly, the court did not err in finding respondent unfit to care for the minor and granting guardianship to DCFS with the right to place.

## CONCLUSION

The judgment of the circuit court of Peoria County is affirmed.

Affirmed.

O'BRIEN and HOLDRIDGE, JJ., concur.