No. 3--10--0556

Opinion filed May 3, 2011

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2011

| | | |
|---|---|---|
| *In re* R.R. AND K.R., | ) | Appeal from the Circuit Court |
| | ) | of the Tenth Judicial Circuit |
|     Minors | ) | Peoria County, Illinois |
| | ) | |
| (The People of the State of | ) | |
| Illinois, | ) | |
| | ) | Nos. 10--JA--95 |
|     Petitioner-Appellee, | ) |     10--JA--96 |
| | ) | |
|     v. | ) | |
| | ) | |
| Anna R. | ) | Honorable |
| | ) | Richard D. McCoy |
|     Respondent.) | ) | Judge Presiding. |

_____

JUSTICE LYTTON delivered the judgment of the court, with opinion.
Justices Holdridge and McDade concurred with the judgment and opinion.

_____

**OPINION**

Anna R. is the mother of R.R. and K.R. When R.R. was just over a month old, he was diagnosed with a skull fracture. As a result, the State filed juvenile petitions, alleging that R.R. and K.R. were neglected due to an injurious environment. Following a hearing, the trial court found R.R. and K.R. to be

neglected minors. Thereafter, the court found Anna R. unfit, made R.R. and K.R. wards of the court and placed them in the guardianship of the Department of Children and Family Services (DCFS). Anna R. appeals, arguing that the trial court's neglect and unfitness findings are against the manifest weight of the evidence. We affirm.

Anna R. is the mother of R.R., who was born on February 19, 2010, and K.R., who was born on January 27, 2006. She is married to Ryan R., who is the father of both R.R. and K.R.

On February 24, 2010, at a doctor's visit, Anna R. mentioned that R.R.'s lips had turned blue three times the day before. R.R.'s doctor instructed Anna R. to take R.R. to the hospital. R.R. was admitted to Saint Francis Medical Center on February 24, 2010. An MRI of R.R.'s brain was performed on February 27, 2010. It showed a right frontal hemorrhage and posterior subdural hematomas. A skeletal survey performed on March 1, 2010, showed no skull fractures. R.R. was released from the hospital on March 1, 2010, with a diagnosis of apnea. Another skeletal survey was performed on March 11, 2010, which showed no skull fractures.

On March 23, 2010, Anna R. brought R.R. back to Saint Francis Medical Center for increased episodes of apnea. An MRI of R.R.'s brain was performed on March 25, 2010. It showed new areas of injury to the left and right temporal lobes. A skeletal

2

survey was performed on March 26, 2010. It showed a skull fracture. R.R. was then referred to the Pediatric Resource Center.

On April 5, 2010, the State filed juvenile petitions alleging that K.R. and R.R. were neglected minors in that their environment was injurious to their welfare because (1) R.R. was diagnosed with a skull fracture and brain bleeds on March 23, 2010, which could not have occurred absent abuse or neglect on the part of the caretaker, (2) following R.R.'s diagnosis, R.R.'s mother and father repeatedly told authorities that they did not know how R.R. was injured, and then on March 30, 2010, reported that R.R.'s head hit a door while being held by his father, (3) R.R. was diagnosed with a brain bleed and bruising to his back on February 23, 2010, (4) Ryan R. committed domestic violence against Anna R. on two occasions in 2006 when K.R. was present, and (5) Ryan R. had a criminal record that included burglary, consumption of alcohol by a minor and possession of drug paraphernalia.

On April 26, 2010, Anna R. filed an answer to the juvenile petition, stipulating that the State would call witnesses at adjudication who would support all of the allegations contained in the petition. However, she denied causing any injury to R.R. She also stated that she did not think that R.R. "hitting his

3

head on the door was serious enough to mention" and that she was "trying to cooperate." Finally, she denied seeing any bruising on R.R.'s back on February 23, 2010.

An adjudicatory hearing was held on June 10, 2010. At the hearing, the State entered into evidence medical records from Saint Francis Medical Center that showed R.R. had brain bleeds on February 27, 2010, but no skull fracture as of March 11, 2010. A March 25, 2010, MRI showed new areas of injury to R.R.'s brain, and a skeletal survey performed on March 26, 2010, showed a skull fracture.

The State also introduced the report of Dr. Channing Petrak, a physician at the Pediatric Resource Center. After physically examining R.R. and reviewing his medical records and other investigatory information, she concluded that the hemorrhage and hematomas shown on R.R.'s February 27, 2010, MRI could have been "due to birth." However, she found that the new injuries to R.R. shown on the March 25, 2010, MRI were "clearly not due to birth trauma." She found that they "were inflicted and due to abusive head trauma." Additionally, she opined that R.R.'s skull fracture was "inflicted." Dr. Petrak noted in her report that Anna R. told police that she bumped R.R.'s head on a plastic laundry basket and that Ryan R. told police that he accidentally bumped R.R.'s head on the edge of a door. Dr. Petrak found that

4

"[n]either of these histories explains Ryan's head injuries."

The State argued that R.R.'s injuries "could not have happened absent abuse and neglect on the part of the caretaker because these were intentionally inflicted on this minor." The guardian *ad litem*, Linda Groezinger, said that she did not know if R.R.'s injuries were intentional or accidental and, thus, could not ask the court to find abuse or neglect.

Anna R. and Ryan R. denied inflicting any injuries on R.R. Anna R. argued that R.R.'s brain injuries, including his skull fracture, could have been accidental. The court ruled that based on Dr. Petrak's report, it had no choice but to find "environmental neglect" by Anna R. and Ryan R. because of R.R.'s injuries. The court did not attribute R.R.'s injuries to either parent.

A dispositional hearing was held on July 12, 2010. At the hearing, the trial court was presented with a report, dated June 25, 2010, from K.R. and R.R.'s caseworker, Danny Walker of Counseling & Family Services. Walker found K.R. to be a "very happy 4 year old girl," and R.R. to be "a healthy 5 month old boy." He stated that he was "very optimistic about [K.R.] and [R.R.] achieving reunification as both parents are engaged in services and appear to be working diligently to correct the conditions which brought this case to the attention of DCFS."

5

Walker recommended that Anna R. (1) be found fit, (2) participate in and successfully complete individual psychotherapy, (3) successfully complete a domestic violence class, (4) participate in random drug testing, and (5) complete a psychiatric evaluation.

Groezinger, the guardian *ad litem*, also recommended that Anna R. be found fit. The State argued that Anna R. should be found unfit based on R.R.'s "unexplained skull fracture." Anna R. urged the court to accept Groezinger's and Walker's recommendations and find her fit. At the time of the hearing, Anna R. was attending domestic violence and parenting classes but had not yet completed a psychiatric evaluation.

The trial court entered an order finding that it was in the best interests of K.R. and R.R. to be made wards of the court, with guardianship awarded to DCFS. The court found Anna R. unfit.

## I. Neglect

Anna R. argues that the trial court erred in finding R.R. and K.R. neglected based on the report of Dr. Petrak because it contained inadmissible hearsay. The State responds that the trial court properly relied on Dr. Petrak's report to find R.R. and K.R. neglected.

Under section 2--3--1(b) of the Juvenile Court Act of 1987

6

(Act), a neglected minor includes "any minor under 18 years of age whose environment is injurious to his or her welfare." 705 ILCS 405/2--3(1)(b) (West 2008). Generally, "neglect" is defined as "the failure to exercise the care that circumstances justly demand." (Internal quotation marks omitted.) *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). The term "injurious environment" is generally "interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." (Internal quotation marks omitted.) *Id.*

The terms "neglect" and "injurious environment" have fluid meanings that vary with the facts and circumstances of a particular case. *In re J.C.*, 396 Ill. App. 3d 1050, 1056 (2009). "Accordingly, cases involving allegations of neglect *** are *sui generis*, and must be decided on the basis of their unique circumstances." *Arthur H.*, 212 Ill. 2d at 463.

At an adjudicatory hearing, the court is to focus solely on whether the child has been neglected, not whether one or both of the child's parents are responsible for the neglect. *Arthur H.*, 212 Ill. 2d at 466. The court should not consider the acts and/or omissions of the child's parents in arriving at a determination of neglect. *Id.* Proof of neglect of one minor is admissible evidence on the issue of neglect of any other minor for whom the parent is responsible. *Id.* at 468.

7

The State bears the burden of proving allegations of neglect by a preponderence of the evidence. *J.C.*, 396 Ill. App. 3d at 1056. On review, a trial court's ruling of neglect will not be reversed unless it is against the manifest weight of the evidence. *Arthur H.*, 212 Ill. App. 3d at 464. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Id.*

An expert witness may not base his opinion on conjecture or speculation. *Mesick v. Johnson*, 141 Ill. App. 3d 195, 205 (1986). However, a physician may testify to what might or could have caused an injury even if the testimony is inconclusive. *Id.* In forming their opinions, medical professionals can reasonably rely on information known to them by their patients, by medical records or by any other data reasonably relied upon by medical professionals in forming opinions or inferences upon the subject. *Moran v. Erickson*, 297 Ill. App. 3d 342, 353-54 (1998).

It is reasonable for a medical professional to rely on information supplied by the patient or someone with an interest in the patient's well being. *Moran*, 297 Ill. App. 3d at 354; *People v. Roy*, 201 Ill. App. 3d 166, 179 (1990). A medical expert's opinion as to the cause of injuries that is based on his examination of the patient and the medical history related by the patient is proper and admissible. See *Mesick*, 141 Ill. App. 3d

8

at 206.

Here, the State introduced as evidence the report of Dr. Petrak, in which she opined that R.R.'s "head injuries, with the exception of the possible birth injuries, were inflicted and due to abusive head trauma." Anna R. did not object to the admission of Dr. Petrak's report but merely disagreed with Dr. Petrak's conclusion that R.R.'s head injuries were inflicted. She argued that R.R.'s injuries could have been accidental but presented no evidence or expert testimony to support her position.

Based on the evidence presented at the adjudicatory hearing, the trial court's finding of neglect was not against the manifest weight of the evidence. The only medical opinion regarding R.R.'s injuries was Dr. Petrak's report. The report was proper and admissible, as it contained Dr. Petrak's medical opinion based on her physical examination of R.R., information relayed to her about R.R., and R.R.'s medical records. See *Moran* 297 Ill. App. 3d at 353-54; *Mesick*, 141 Ill. App. 3d at 206. Furthermore, Anna R. did not object to admission of the report, thereby forfeiting any error on appeal and allowing the evidence to be considered by the trier of fact. See *People v. Ramsey*, 205 Ill. 2d 287, 293 (2002).

According to Dr. Petrak, R.R. had head injuries that were inflicted and caused by "abusive head trauma." Since R.R. was

9

just weeks old and had been solely in the care of Anna R. and Ryan R. when he sustained those injuries, the trial court's finding that R.R. and K.R. were neglected is supported by the evidence. See *In re J.W.*, 386 Ill. App. 3d 847, 856-57 (2008) (unexplained injuries to an infant were sufficient to establish neglect).

## II. Unfitness

Anna R. also argues that the trial court erred in finding her unfit at the conclusion of the dispositional hearing since the caseworker and guardian *ad litem* both recommended that she be found fit.

In determining whether a neglected minor's parent is fit to care for the minor, the court must consider whether "the best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." 705 ILCS 405/2--27(1) (West 2008). We will reverse a trial court's finding of unfitness only if it is against the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). We give deference to the trial court as to findings of fact and will not substitute our judgment for that of the trial court. *Id.*

The trial court is not required to adopt a caseworker's recommendation that a parent be found fit. See *In re K.R.*, 356 Ill. App. 3d 517, 523 (2005). Completing some required services

does not, in and of itself, make a parent fit, particularly where other required services are still ongoing. See *J.C.*, 396 Ill. App. 3d at 1059-60.

Here, evidence admitted at the dispositional hearing indicated that Anna R. was cooperating with DCFS and her caseworker to complete the services required of her, including parenting and domestic violence classes. Nevertheless, she still had services to complete, including a psychiatric evaluation and counseling. Although it appears that Anna R. is on her way to becoming fit, in light of the unexplained injuries to R.R. and Anna R.'s need to complete further services, the trial court's finding that Anna R. was unfit at the time of the dispositional hearing was not against the manifest weight of the evidence.

The order of the Peoria County circuit court is affirmed.

Affirmed.

11