NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (4th) 221043-U

NOS. 4-22-1043, 4-22-1044 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 26, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* S.S. and L.F., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Fulton County |
| Petitioner-Appellee, | ) | Nos. 22JA1 |
| v. | ) | 22JA2 |
| Jessica S., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | William A. Rasmussen, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Harris and Doherty concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed, holding the trial court's neglect finding was not against the manifest weight of the evidence.

¶ 2   Respondent, Jessica S., is the mother of L.F., age 11, and the legal guardian of S.S., age 7. The minors were adjudicated neglected and subsequently made wards of the court. Respondent appeals the adjudicatory order only, claiming (1) the State failed to sufficiently prove the allegations of neglect by a preponderance of the evidence as to both minors and (2) the trial court erred by applying a *per se* rule of anticipatory neglect as to L.F. We affirm.

¶ 3                          I. BACKGROUND

¶ 4   On January 16, 2022, the Department of Children and Family Services (DCFS) received a report that S.S. was receiving questionable treatment by respondent, her legal guardian

and stepgrandmother. It was reported that on January 14, 2022, S.S. was left in a recreational vehicle (RV) for over four hours, where she was monitored by a video camera system. Respondent, her husband Richard S., and L.F. were inside a residence at a holiday gathering. Respondent reportedly repeatedly ordered S.S. to stay on the bed in the RV. S.S. was allowed to enter the residence to eat. However, according to the reporter, S.S. appeared to be " 'emaciated.' " The next day, S.S. was again kept in the RV for two to three hours at the same location. S.S. was eventually allowed to enter the residence but was ordered to remain at a table in a room separate from where the family's holiday gift exchange was occurring. According to the reporter, respondent had told her a psychiatrist agreed that S.S. should be locked up, "grounded," and away from other people. The reporter also said respondent kept a gate on S.S.'s bedroom door.

¶ 5        On January 28, 2022, after investigating the report, the State filed a petition for adjudication of neglect in the interest of S.S. (Fulton County case No. 22-JA-1). On February 1, 2022, the State filed an amended petition as to S.S., adding an allegation of abuse, and an original petition in the interest of L.F. (Fulton County case No. 22-JA-2). These cases were combined in the trial court and have been consolidated in this appeal.

¶ 6        The allegations in the petitions of the two cases generally mirrored each other. That is, the State alleged S.S. was a neglected and abused minor, while L.F. was neglected and abused because she resided in the same home as S.S. Specifically, the State alleged (1) S.S. was a neglected minor because she was not receiving the care necessary for her well-being from respondent as her guardian in that she was not receiving adequate food (705 ILCS 405/2-3(1)(a) (West 2020)) (count I); (2) S.S. was a neglected minor because respondent left the minor without supervision for an unreasonable period of time without regard for S.S.'s mental or physical health, safety, or welfare (*id.* § 2-3(1)(d)) (count III); and (3) S.S. was an abused minor because

- 2 -

respondent had committed or allowed to be committed an act or acts of torture upon her (*id.* § 2-3(2)(iv)) (count IV). The State alleged L.F. was neglected and abused on the same grounds because she resided in the same home as S.S. and the person responsible for S.S.'s neglect and abuse was L.F.'s mother, respondent. Respondent was not named in count II of either petition.

¶ 7        On May 12, 2022, the trial court conducted an adjudicatory hearing. The following is a summary of the testimony relevant to the issues raised in this appeal.

¶ 8        Marci Well, S.S.'s pediatrician, testified she last treated S.S. in September 2019. At the time, S.S. had a bruise on her cheek and on her head. This appointment had been "suggested to the family by DCFS" after she had fallen at school. S.S. weighed 37 pounds—a "smaller than average" weight but not worrisome.

¶ 9        Amy Stufflebeam, the caseworker, testified she was assigned the case the day after DCFS received the hotline call. As a result of the call, on January 17, 2022, Stufflebeam and a deputy sheriff made contact with respondent at her home. Respondent told them S.S. was "grounded because she had shit and pissed on her floor." Once Stufflebeam spoke with S.S. alone, she learned S.S. had not eaten breakfast or lunch that day. This conversation took place at approximately 3:30 p.m. S.S. told Stufflebeam she was hungry and Stufflebeam escorted S.S. to the kitchen. S.S. asked respondent if she could have lunch and respondent said, " 'Of course.' " Stufflebeam stepped outside to call her supervisor. She said after she had returned inside, she noticed S.S. had eaten "every single bite of those [two] corn dogs and [she] picked up that glass of milk and drank it without stopping before putting it down."

¶ 10        Stufflebeam spoke with L.F., who denied any abuse and advised that S.S. was "troublesome" for respondent, was "bad," and was punished or grounded " 'most of the time.' " L.F. said S.S. "poops her pants and gets in trouble." Stufflebeam asked L.F. to say one good thing

about S.S. and L.F. said, " 'I can't think of anything good about [S.S.]' " When asked if there was any fighting among the adults in the home, L.F. said yes, respondent and Richard fight with " '[w]ords and sometimes their hands.' " L.F. told Stufflebeam S.S. was in trouble at the time of the holiday gathering, so she had to stay in the RV and stay on the bed.

¶ 11　　　　Stufflebeam testified that, during her conversation with respondent about S.S., respondent indicated she knew who the reporter was and described her as one who "can't keep their nose out of their business." Stufflebeam inquired whether S.S. had a medical condition that caused incontinence. Respondent denied the existence of any medical issue and said the reason S.S. soils her pants and defecates in her room " 'is because she's an asshole' " and "lazy." Respondent told Stufflebeam she had previously taken S.S. to a therapist, who told respondent S.S. was "defiant" and "that everything that [respondent] was doing for discipline was appropriate and that she should continue doing what she was doing."

¶ 12　　　　Stufflebeam testified respondent then agreed to allow her to speak with S.S. alone. They went to S.S.'s bedroom and, at this point, everything Stufflebeam had already asked S.S. about had changed. S.S. now said she eats every day, the gate on her bedroom was never closed, she was never locked in her room, everything was fine, and she was not scared to be there. She said she had to stay in the RV because she was in trouble but did not know why.

¶ 13　　　　Stufflebeam described seven-year-old S.S. as "extremely skinny[ and] very frail." She said her eyes and cheeks were "sunken [in]."

¶ 14　　　　Stufflebeam spoke with respondent about the gate on S.S.'s bedroom. Respondent explained it was for S.S.'s safety. Respondent said S.S. gets up in the middle of the night and "get[s] into things *** and get[s] pills." She also said S.S. had "gotten outside before." Stufflebeam questioned respondent about using a regular bedroom door with an alarm instead of using a gate,

but respondent indicated doors were expensive. Stufflebeam described the gate as being approximately chin-high for S.S. and it was locked from the outside.

¶ 15 Respondent agreed to intact services with counseling, but those intact services were never started because, according to Stufflebeam, "there was more that happened within the investigation." Stufflebeam explained that on January 28, 2022, when she accompanied the intact worker to respondent's home for introductions, respondent answered the door but blocked the view into the home. Respondent indicated S.S. had " 'bruises all over her' " from fighting with respondent for over an hour in the bathtub. However, they were not able to see S.S. because she was currently at respondent's mother's house. Stufflebeam searched for the identity of respondent's mother and then drove to Hazel W.'s house. There, Hazel reported she had not seen S.S. in over two years. Stufflebeam contacted her supervisor and was told to take S.S. into protective custody when she was found.

¶ 16 Stufflebeam testified she went back to respondent's house, accompanied by two police officers, and made contact with Richard S., respondent's husband. Richard claimed respondent and the minors were not home and would be gone for hours. Stufflebeam and the officers waited for respondent's return. They eventually approached the residence again, showing Richard a warrant for S.S.'s custody. While searching the home, one of the officers found respondent, S.S., and L.F. hiding in the attic.

¶ 17 Stufflebeam testified she took S.S. into protective custody and was going to take her to the hospital. They stopped at McDonald's on the way. S.S. ate four chicken nuggets, french fries, apple slices, two containers of apple juice, and all of Stufflebeam's french fries. S.S. said she was still hungry, so Stufflebeam bought her a blueberry muffin, which she "devoured." At the hospital, the doctors diagnosed her with dehydration. She weighed 37.9 pounds. She had a black

eye, a football-sized bruise on her back, a "pretty substantial gash out of her chin," a "gash out of the inside of her left ankle," bruises on her legs, and several bruises on her buttocks.

¶ 18 On January 30, 2022, Stufflebeam took protective custody of L.F. "[b]ecause of the abuse and neglect that [S.S.] had sustained while in the home, and since she was another child in the home, she need[ed] to be removed as well."

¶ 19 Respondent told Stufflebeam she was the guardian of S.S. because S.S. had contracted salmonella poisoning and was hospitalized when she was six months old. According to Stufflebeam's conversation with Stephanie, S.S.'s biological mother, respondent "forced" her to sign over guardianship to respondent at a time when Stephanie was unable to care for S.S. Stephanie last saw S.S. when she was approximately one year old. Stufflebeam testified Stephanie was interested in obtaining custody of S.S.

¶ 20 On cross-examination, Stufflebeam testified S.S. had a cardboard sign in her bedroom over her desk that said " 'I pee my pants.' " According to Stufflebeam, S.S. was unable to open the gate to her room. If she had to use the restroom, she had to yell for respondent to let her out.

¶ 21 At the conclusion of Stufflebeam's testimony, the State asked the trial court to take judicial notice of an order of probation from a McDonough County court case where respondent was convicted of cruelty to animals. Upon respondent's objection on relevance grounds, the State argued the evidence tended to demonstrate respondent's propensity to "not take care of things that are under her control." The court agreed to take judicial notice.

¶ 22 Fulton County Sheriff's Deputy Tim Harper testified about the events that occurred on January 28, 2022, when he accompanied Stufflebeam to respondent's residence. He searched the residence for respondent and S.S. In an upstairs bedroom closet, he "separated the clothes on

the hangers to see if there was any type of doors or whatnot." He said he saw a door with a large blue tote sitting in front of the door. He pushed the tote away from the door, opened it, and found S.S., L.F., and respondent in the crawl space.

¶ 23       Dr. Channing Petrak, a pediatrician and the medical director of the Pediatric Resource Center, testified he was board certified in child abuse pediatrics. He testified he evaluated S.S. on January 31, 2022, at Children's Hospital of Illinois. Dr. Petrak testified S.S. explained the layout of her bedroom. She said she had a gate in her bedroom doorway that she was unable to unlock, and she had a bucket in her room to use for the bathroom. On some occasions, if she yelled "really loud," she would be allowed to go into the bathroom, but she would have "to go right back to her room."

¶ 24       Dr. Petrak questioned S.S. about her visual injuries. S.S. said the bruise on her back was from slipping in the tub and the cut on her chin was from the gate. She indicated the bruises on her buttocks were from being spanked by respondent. Dr. Petrak noted S.S.'s weight was low and below the growth curve. She had gained 0.9 pounds in two years, when she would have been expected to gain four to eight pounds per year. It appeared from her medical records that S.S. had not been seen by her primary care physician in two years.

¶ 25       According to Dr. Petrak, S.S. showed physical signs of malnutrition. For example, she had very dry and scaly skin, thickened and cracked skin on her feet and palms, and overall "decreased fat stores." She also showed signs of physical abuse. In Dr. Petrak's opinion, "[s]ome of her bruises were not what you would find from typical childhood play."

¶ 26       Stephanie, S.S.'s biological mother, testified that throughout her childhood, she moved between her father's home and her mother's home. Her father, Richard, was married to

respondent. Respondent often disciplined Stephanie with corporal punishment, timeouts, and loss of privileges.

¶ 27 Stephanie gave guardianship of S.S. to respondent upon respondent's request when S.S. was an infant because Stephanie was unemployed and homeless, though she was living with respondent and Richard. In 2015, respondent and Richard "kicked [her] out of the house" because they felt Stephanie was not making sufficient efforts to better herself. Stephanie said she was not "welcome back at the house." And therefore, she has had little to no contact with S.S.

¶ 28 Respondent called her 18-year-old daughter, Skylar S., as a witness. She began her testimony with an explanation of the holiday party and the RV. Skylar said, on that day, S.S. was grounded for "pooping and peeing on the floor and everything at the house." Skylar was not sure why S.S. did such things and recalled that when they asked S.S. for an explanation, she said she was mad at them. On the day of the party, respondent told S.S. to stay in the RV because she was not allowed to play with the other children at the holiday gathering. According to Skylar, respondent allowed S.S. to come into the house during the meal, but she had to open her gifts at the table away from the other children. Skylar's cousin, Harley, expressed her opinion that it was unfair that S.S. was not allowed to play with the other children. Harley and respondent argued about the situation until respondent and her family left the party.

¶ 29 Skylar described S.S.'s bedroom as having a toddler bed, toys, shelves, a television, and a dollhouse. She said there was no door on S.S.'s bedroom but there was a "child's gate that went up at night so she wasn't getting into anything." Skylar said S.S. "could open it on her own if she needed to." Skylar said S.S. ate three meals a day plus snacks.

¶ 30 Skylar said S.S. would often act out by refusing to do her homework, throwing or slamming things, or going to the bathroom throughout the house. With regard to the bathtub

incident, Skylar said S.S. was in her bedroom "doing her own thing" when Skylar smelled something suspect. She went to the bedroom, where she found S.S. had taken off all her clothes and "peed and pooped all over her room." Respondent said she was going to take a photograph "to show DCFS what she's doing." Skylar said when S.S. heard that, she "started throwing a fit and throwing herself around." They got S.S. upstairs into the bathtub, but she refused to wash herself. The following exchange occurred

¶ 31 "Q. Okay. Okay. And then once you got her in the bathtub, what happened?

A. She was wanting to throw a fit because she didn't want to wash herself, and at our house, if you're being that age and you're purposefully pooping and peeing yourself, you have to wash yourself, and [S.S.] is more than capable of washing herself, and she went to go throw herself down, and mom went to go catch her which caused mom to fall, and I quickly caught mom from behind. My dad was on the phone with my mom, and he says, 'Jess, stopping [*sic*] hurting herself, let her throw her fit.' So we took a step back, we closed the curtain, mom sat on the toilet, I sat on the floor, and every now and then we'd open up the curtain, look in, try talking to her to calm her down, wouldn't work, so we'd close the curtain again. Eventually, she did calm down and washed herself up, we got her out, we—

Q. When she was having this sort of episode, I suppose, what was [S.S.] doing?

A. She was screaming, hitting, kicking, throwing herself around, saying [']I hate you,['] and everything she could think of really.

Q. Okay. And then what happened after that?

A. After we got her out of the shower, we dried her off and everything, we went back downstairs, sat down, after cleaning up her room and everything, but we went back downstairs, sat down, later on we had some supper, and went to bed, and the next day, my mom took [S.S.] to my grandma's just so we could have a cool down."

The record indicates the "grandma" Skylar was referring to was not respondent's biological mother, Hazel W., but her adopted mother, Jonnie S.

¶ 32 After considering the evidence and arguments of counsel, the trial court found the State had proved by a preponderance of the evidence the minors were neglected. The court found respondent was not providing adequate food and care to S.S. The court relied on (1) the medical testimony, which indicated S.S. was well below average in terms of her weight, (2) Stufflebeam's testimony regarding S.S.'s conversations with her regarding her lack of food, and (3) the fact respondent was hiding with the minors to avoid DCFS.

¶ 33 The trial court also found L.F. neglected. The court stated: "If there's neglect in the house for one, there's neglect in the house for the other."

¶ 34 On July 7, 2022, the trial court conducted a dispositional hearing. The State presented as its only evidence the integrated assessment, family service plan, and the June 29, 2022, dispositional hearing report for each minor.

¶ 35 Richard S. testified that L.F. and respondent had a good relationship. In his view, respondent took good care of L.F. and provided for all her needs.

¶ 36 The trial court found respondent unfit as to both minors and made the minors wards of the court.

¶ 37    Respondent filed a motion to reconsider the adjudicatory order, which the trial court denied.

¶ 38    This appeal followed.

¶ 39                    II. ANALYSIS

¶ 40    Initially, we note, in respondent's amended notice of appeal and in the concluding paragraph of her opening brief, she mentions appealing the findings from the dispositional hearing. However, she makes no argument as to the trial court's determination of her fitness, and therefore, we find that argument forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (stating points not argued in an appellant's opening brief are forfeited).

¶ 41    In her brief, she claims the State failed to prove by a preponderance of the evidence that both minors were neglected as determined by the trial court. In its adjudicatory order, the court found both minors were neglected in that they were in an environment injurious to their welfare pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2020)). We note respondent made no objection to the court's injurious-environment finding because that ground was not alleged against respondent in the petition. See *In re April C.*, 326 Ill. App. 3d 225, 242 (2001) ("Where a party fails to make an appropriate objection in the court below, he or she has failed to preserve the question for review and the issue is [forfeited]."). As to S.S., the court based its finding on the "lack of care or concern; failure of [respondent] to provide food." As to L.F., the court based its finding on the "[f]ailure to show care or concern; failure to provide food to minor in home."

¶ 42    In a petition for adjudication of wardship under the Act, the "paramount consideration is the best interest of the child" *In re J.W.*, 386 Ill. App. 3d 847, 856 (2008). The State must prove its allegation of neglect by a preponderance of the evidence. *In re N.B.*, 191 Ill.

2d 338, 343 (2000). Preponderance of the evidence means proof that makes the condition more probable than not. *Id.* Upon review, the trial court's finding "[shall] not be disturbed unless it is against the manifest weight of the evidence." *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001).

¶ 43 Generally, Illinois courts have interpreted "injurious environment" to mean a breach of a parent's duty to ensure a safe and nurturing shelter for her minor children. *N.B.*, 191 Ill. 2d at 346. The State may use the evidence of neglect of one child as evidence of neglect of another child who lives in the same household and for whom the same parent is also responsible. *In re T.B.*, 215 Ill. App. 3d 1059, 1062-63 (1991) ("Where an injurious environment has been found to exist, the trial court need not wait until the child becomes a victim or is emotionally damaged permanently in order to remove the child from the household."); *In re R.R.*, 409 Ill. App. 3d 1041, 1045 (2011) ("Proof of neglect of one minor is admissible evidence on the issue of neglect of any other minor for whom the parent is responsible."). In fact, section 2-18(3) of the Act states: "In any hearing under this Act, proof of the abuse, neglect or dependency of one minor shall be admissible evidence on the issue of the abuse, neglect or dependency of any other minor for whom the respondent is responsible." 705 ILCS 405/2-18(3) (West 2020).

¶ 44 A. Allegation of Inadequate Food for S.S.

¶ 45 Respondent claims the State failed to prove S.S. did not receive adequate food. She claims the testimony of Stufflebeam, L.F., and Skylar supports her claim. Stufflebeam testified that during her second conversation with S.S., the child said she eats three meals a day. L.F. and Skylar corroborated S.S.'s claim, each testifying that S.S. received and had access to adequate food. Respondent argues the doctors' testimony that S.S. was small for her age did not prove it was more probable than not her weight and size were from a lack of food.

¶ 46 Respondent's argument ignores the magnitude of the evidence demonstrating S.S. was underfed and malnourished. The evidence of her weight alone suggests inadequate food. Dr. Petrak testified S.S. had gained less than a pound in two years, when a typical child would be expected to gain four to eight pounds a year. That is, S.S. should have gained 8 to 16 pounds between her reported doctor's visits. Stufflebeam described S.S. as "extremely skinny" and "very frail." She said her eyes and cheeks were "sunken [in]." According to Dr. Petrak, S.S. showed physical signs of malnutrition, such as very dry and scaly skin, thickened and cracked skin on her feet and palms, and overall "decreased fat stores." The evidence also demonstrated that S.S. told Stufflebeam at 3:30 p.m. she was hungry, as she had not eaten breakfast or lunch that day. Stufflebeam also described witnessing S.S.'s unusual consumption of food and drink—as if she was ravenous.

¶ 47 Based on this evidence and contrary to respondent's position, we conclude the trial court's finding that S.S. was neglected based on respondent's failure to provide adequate food was not against the manifest weight of the evidence. We find the State established the allegations of neglect are more probably true than not. That is, it is more probably true than not, based on this evidence, that S.S. was in an environment injurious to her welfare because respondent failed to provide her with adequate food.

¶ 48 Having found sufficient evidence to support the trial court's order adjudicating S.S. neglected based upon an injurious environment due to respondent's failure to provide adequate food, it is not necessary to address any further grounds or bases therefor. See *In re Faith B.*, 216 Ill. 2d 1, 15 (2005) (the court found the minors neglected on one basis and determined there was no need to review the additional bases).

¶ 49 B. Anticipatory Neglect of L.F.

¶ 50       Respondent also claims the State failed to prove by a preponderance of the evidence that L.F. was a neglected minor. In particular, respondent claims the trial court erred in finding L.F. neglected based on anticipatory neglect. Respondent argues, because the State presented no evidence relating specifically to the neglect of L.F., the court's finding L.F. was a neglected minor was in error. We disagree.

¶ 51       As our supreme court has found, under a theory of anticipatory neglect, the State seeks to protect not only minors who are direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside with an individual who has been found to have neglected or abused another child. *In re Arthur H.*, 212 Ill. 2d 441, 468 (2004). Respondent relies on *Arthur H.* for the following proposition: "[T]he mere admissibility of evidence does not constitute conclusive proof of the neglect of another minor. Each case concerning the adjudication of minors, including those cases pursued under a theory of anticipatory neglect based upon the neglect of a child's sibling, must be reviewed according to its own facts." *Id.* at 468-69.

¶ 52       We reject respondent's reliance on *Arthur H.* as factually distinguishable. In that case, the evidence clearly established the minor in question did not live in the same home, or even the same state, as the abused and neglected minors. See *id.* at 472-73. Because the minor was not exposed to the same environment as the other abused and neglected minors, our supreme court concluded the subject minor was not exposed to the same risk of harm and therefore not neglected. *Id.* at 478. Unlike the minor in *Arthur H.*, L.F. lived in the same home as S.S. and was under the care and control of respondent, just like S.S., and was therefore exposed to the same risk of harm.

¶ 53       For these reasons, we conclude the trial court's finding of anticipatory neglect was not against the manifest weight of the evidence.

¶ 54                        III. CONCLUSION

¶ 55        For the reasons stated, we affirm the trial court's judgment.

¶ 56        Affirmed.