2021 IL App (1st) 210304-U

SIXTH DIVISION
September 24, 2021

Nos. 1-21-0304 & 1-21-0308 (cons.)

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* Ki.C., B.C., and Ka.C., Minors, | ) | |
| | ) | |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | Nos. 19 JA 955 |
| TABETHA C., | ) | 19 JA 956 |
| | ) | 19 JA 957 |
| Mother-Respondent-Appellant, | ) | |
| | ) | |
| and | ) | Honorable |
| | ) | Maxwell Griffin, Jr., |
| KEITH H., | ) | Judge Presiding. |
| | ) | |
| Father-Respondent-Appellant). | ) | |

JUSTICE MIKVA delivered the judgment of the court.
Presiding Justice Pierce concurred in the judgment.
Justice Oden Johnson specially concurred.

**O R D E R**

¶ 1    *Held*: The trial court's finding that the minors were neglected due to an injurious environment was not against the manifest weight of the evidence.

¶ 2     Following a dispositional hearing, minors Ki.C., B.C., and Ka.C. were adjudged to be wards of the court and Tabetha C. and Keith H. were found to be unable to parent Ki.C. and Ka.C. On appeal, Tabetha and Keith contend that the adjudication findings that Ki.C. and Ka.C. were neglected due to an injurious environment were against the manifest weight of the evidence. For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4     On August 29, 2019, the State filed petitions for adjudication of wardship alleging that Ki.C., a female born May 2, 2003, then 16 years old, and Ka.C., a male born December 9, 2015, then three years old, were abused and neglected. The State also filed a petition alleging that the minors' sibling, B.C., a male born June 1, 2008, then 11 years old, was abused and neglected. However, the court's findings regarding B.C. are not part of this appeal.

¶ 5     The petitions alleged that (1) the minors were neglected because they were minors under the age of 18 who were not receiving proper care (705 ILCS 405/2-3(1)(a) (West 2018)), (2) their environment was injurious to their welfare (705 ILCS 405/2-3(1)(b) (West 2018)), and (3) they were abused because their parents created a substantial risk of physical injury other than by accidental means (705 ILCS 405/2-3(2)(ii) (West 2018)).

¶ 6     At the temporary custody hearing on August 29, 2019, the trial court found probable cause to support the allegations of abuse and neglect and entered an order granting temporary custody of the minors to the Illinois Department of Children and Family Services (DCFS) guardianship administrator. On October 18, 2019, the trial court made a finding that Keith is the father of Ki.C. and Ka.C. but that he is not the father of B.C. The State obtained leave to file an amended petition, on October 21, 2019, alleging a recent incident of domestic violence between Tabetha and Keith, that the State claimed further supported the allegations of neglect and abuse.

2

¶ 7     The adjudication hearing was held on November 19, 2019. The State's witnesses were Chicago police officer Antonio Phillips, and two DCFS child protection investigators—David Ruano and Toni Dunlap.

¶ 8     Officer Phillips testified that on August 10, 2019, he and his partner, Officer John Clark, responded to a domestic battery call at 2505 West Lithuanian Plaza Court in Chicago. When they arrived, they entered an apartment and heard a disturbance coming from the rear. Officer Phillips saw Ki. C. and identified himself to her as a police officer. She escorted the police to the back of the apartment, where they saw Tabetha and Keith. Keith was holding a gun, with an extended magazine, wrapped in a white t-shirt. When Keith saw the officers, he fled back to the rear of the apartment and Officer Phillips chased him. Keith ran out of the back door to the backyard, tossed the gun over a fence, climbed over the fence, and continued running. Officer Phillips climbed over the fence, recovered the gun, and continued the chase until he caught up with Keith and handcuffed him. Officer Phillips then returned to the apartment. Tabetha told the officer that she and Keith were arguing because she gave her phone number to someone. The fight turned physical when Keith hit her on the head with a gun. Officer Clark read Keith his rights and asked if he had a concealed carry license or a FOID card, and Keith replied that he did not and that he was a convicted felon. Keith was arrested and transported to the police station.

¶ 9     David Ruano testified that he was assigned to work on the minors' case on May 23, 2019, specifically to investigate cuts, welts, and bruises to B.C. who was receiving care at Holy Cross Hospital. Mr. Ruano spoke with Tabetha who told him that B.C. had been diagnosed with bipolar, schizophrenia, attention-deficit/hyperactivity disorder (ADHD), obsessive compulsive disorder (OCD), and autism-spectrum disorder. She also indicated that B.C. had been psychiatrically hospitalized twice and that he was prescribed Seroquel and Abilify. Tabetha reported that B.C.

3

was "doing fine" on the Seroquel but refused the Abilify.

¶ 10    On cross-examination, Mr. Ruano acknowledged that it appeared that Tabetha understood B.C.'s mental health needs. He also acknowledged that Tabetha told him that she had contacted the staff at Ada S. McKinley Community Services, Inc., but they had not followed up with her.

¶ 11    Toni Dunlap testified that she was assigned to investigate the minors' case in late May 2019. However, her first contact with Tabetha did not occur until July 22, 2019. She testified that the delay was due to other cases with safety concerns that needed her immediate attention. In reviewing the family's history, Ms. Dunlap learned that Tabetha had two previous indicated reports concerning B.C.: April 2017 for medical neglect and December 2017 for substantial risk of injury and injurious environment due to a delay in seeking mental health care.

¶ 12    Ms. Dunlap's July 22, 2019, contact with Tabetha was a phone call. She let Tabetha know that she was the assigned investigator to the case and inquired about B.C. Tabetha stated that he was doing better after being on his medication and that he had an appointment at Under the Rainbow Mental Health Center for mental health treatment on August 5, 2019. Ms. Dunlap offered Tabetha intact family services and stated that she thought it would be beneficial for B.C. to receive additional support. Ms. Dunlap testified that Tabetha replied that she did not want a worker coming to her home every week and declined services.

¶ 13    Ms. Dunlap informed Tabetha that she needed to see her home and all of the children for a well-being check. They scheduled a meeting for July 24, 2019. On July 24, however, Tabetha told Ms. Dunlap that Ki.C. and B.C. were not home, but that she had Ka.C. with her at work and Ms. Dunlap could come see her there. Ms. Dunlap testified that she did that and that Ka.C. appeared to be well.

¶ 14    During this meeting, Tabetha told Ms. Dunlap that she had history of domestic violence

with Keith from approximately two years prior but that they were no longer in a relationship. Ms. Dunlap inquired about Tabetha's own mental health needs, and she indicated that she was diagnosed with depression. Tabetha told Ms. Dunlap that received treatment at Under the Rainbow, which is part of Mount Sinai Hospital.

¶ 15    Ms. Dunlap testified that at some point she spoke to the primary care doctor for Ka.C. and Ki.C. and was told that Tabetha was given referrals for both to get mental health assessments at Under the Rainbow, but that Tabetha did not follow through.

¶ 16    Ms. Dunlap next saw Tabetha on August 28, 2019, at the courthouse. Ms. Dunlap inquired about follow-up treatment for B.C., and Tabetha indicated that he had missed an appointment on August 8, 2019, because he was visiting family. Tabetha told her that B.C. was on the waiting list for Ada S. McKinley and that they always ask the same questions and nothing further ever happened with them other than being put on a waiting list. Ms. Dunlap told Tabetha that due to B.C.'s extensive mental health needs and the lack of follow-up, a decision was made to screen the minors' case into juvenile court. During that same meeting, Tabetha disclosed to Ms. Dunlap the recent domestic violence incident that had occurred on August 10, 2019.

¶ 17    On cross-examination, Ms. Dunlap acknowledged that Tabetha "made herself available" for a home assessment, although one was not completed. She explained that when she went to Tabetha's home on July 24, 2019, no one was there, so she instead saw Tabetha and Ka.C. at another location. Ms. Dunlap also acknowledged on cross examination that Tabetha was agreeable when they first spoke about intact services on July 22, 2019, but that during a follow-up conversation, Tabetha stated that she was not able to participate in intact services due to her work schedule.

¶ 18    The State admitted the following exhibits into evidence: (1) B.C.'s records from Holy

Cross Hospital, (2) B.C.'s records from Miles Square, (3) B.C.'s records from Mount Sinai, (4) a group exhibit consisting of B.C.'s records from Hartgrove Hospital, (5) B.C.'s records from Chatham Family Services, (6) B.C.'s records from Ada S. McKinley, and (7) Ki.C.'s records from Ada S. McKinley.

¶ 19    B.C.'s medical records reflected both the long history of his severe emotional illness and Tabetha's ongoing but often unsuccessful efforts to control his behaviors. He had experienced repeated hospitalizations from at least 2015, when he was seven. B.C. was physically aggressive to his siblings and the police were called. During some of his hospitalizations, B.C. reported to doctors that his mother "whoop[ed]" and "punche[d]" him when he was bad.

¶ 20    The medical records also reflected repeated situations in which Tabetha failed to follow-up with medical care after B.C. was released from the hospital. For example, B.C. was discharged from Hartgrove on June 1, 2017, when he was eight, and the release documents indicated an appointment had been made for him at Ada S. McKinley with Tabetha being instructed to call on June 2, 2017, by 10 a.m. to schedule. However, the Ada S. McKinley records did not indicate any assessment or follow-up treatment. He was then scheduled for follow-up and medication on September 18, 2017, but that appointment was missed, and no medication was prescribed until October 9, 2017. Records from Chatham Family Counseling Center reflect that B.C. was scheduled for intake appointments on August 8, 2018, and December 31, 2018, and he did not arrive for these scheduled appointments nor did the office receive any notification that he would not be present. The medical records also indicated instances that B.C. ran out of medication, exacerbating his behavioral issues.

¶ 21    A City of Chicago Fire Department report dated May 23, 2019, indicated that B.C. was found at a park bench near his school, with his mother nearby, and she was screaming and saying

that she wanted him out of her custody. B.C. was then hospitalized. He reported during that hospitalization that he had been physically abused at home and Tabetha reported that B.C. was threatening family members.

¶ 22    Most of the medical records were related to B.C. However, one exhibit of Ki.C.'s medical records was also entered. These records reflect repeated suicidal plans, that she had run away from home after a fight with her mother and was raped while on run, and that she had witnessed repeated domestic violence between her parents.

¶ 23    The State and the Office of the Cook County Public Guardian (public guardian), which had been appointed to represent the interests of the minors, both rested. The mother then testified on her own behalf.

¶ 24    Tabetha testified that she was the mother of all three minors. She testified that the reason a doctor had recommended mental health evaluations for Ki.C. and Ka.C. was because she had requested them. She had made this request because of "the way they [were]," and because she herself suffered from bipolar manic disorder, trichotillomania, anxiety, stress, and post-traumatic stress disorder. Looking at her children's behaviors, Tabetha felt that they needed to be seen by mental health doctors and noted that each time they went to the doctor's office, all her children "act[ed] a fool." Tabetha further stated that they were referred to Under the Rainbow, but the program was not accepting walk-ins. She testified that all their doctor appointments were scheduled for August.

¶ 25    Tabetha indicated that B.C. had several hospitalizations and was diagnosed as a toddler with "PDD-NOS being on the autism spectrum." He was later diagnosed as being bipolar/schizophrenic with hallucinations, and with ADHD and OCD. She stated that he was given "little goals" by Ada S. McKinley. She testified that she thought he had been seen there on May

7

7, 2019. On May 12, 2019, Tabetha stated that B.C. was combative, and she called "the people." She also called on May 23 and 24, and the police were sent out. Tabetha clarified that "the people" were Ada S. McKinley, and when they went there, B.C. was put on a waiting list because he could not see a doctor at the time.

¶ 26    B.C. was most recently hospitalized in May 2019 at Saint Mary and Elizabeth for two to three weeks and was released on June 1, 2019. Follow-up treatment was to occur at Ada S. McKinley; the hospital had originally referred her to another agency, but Tabetha said that it was too far for her to travel to. B.C. was prescribed medication, either Seroquel or Abilify, and took his medication over the summer.

¶ 27    Tabetha testified that after B.C. was released from the hospital in June 2019, she sent B.C. and Ki.C. to live with Tabetha's father in Calumet City. She testified that B.C. had never met Tabetha's father and Ki.C. had not seen him since she was a toddler. She testified that, according to her father, B.C.'s behavior over the summer was good. She also testified that she spoke to B.C. and Ki.C. everyday while they were staying with her father.

¶ 28    Tabetha testified about her contact with the two child protection investigators earlier that year, Mr. Ruano and Ms. Dunlap. She testified that Ms. Dunlap never told her that they would take her kids if she did not do intact services. Tabetha testified that she was willing to comply with recommended services for B.C. Tabetha further said that she was concerned about Ka.C.'s behavior but felt that he was mimicking B.C.'s behavior because when B.C. was hospitalized, the behavior stopped. Tabetha also stated that she was unable to contact Ms. Dunlap on her own because the calls were always "private" so she could not call back. Tabetha testified that the officer and Ms. Dunlap lied in court. She also testified that she knew that B.C. needed "mental health" and had boxes of paperwork on him; she had been "screaming for help, begging for help," but

social security took his money away which left her unable to pay for certain services because they would not accept just a medical card. She testified that there was nothing she could do but wait on Ada S. McKinley, which gave her paperwork to show the judge if she was asked for proof.

¶ 29    The trial court then addressed Tabetha and indicated that "very little that she said made any sense." Tabetha replied,

"I'm pretty sure it didn't. I get that a lot. What I'm trying to say is [B.C.] is the only—my kids got taken away from me, and I don't think it's fair that my three-year-old has to go through the things he's going through because my eleven-year-old has mental health [*sic*].

I've been—it's—my character has been assassinated by my kids. I don't do nothing to my kids.

But [B.C.] is the only one that seem to be the focus right here, and yet I have mountains and mountains of paperwork stating that he has mental issues. And yet his diagnoses keep changing every time he goes to the doctor, and medicines had been changing over and over and over."

¶ 30    During their interchange with each other, Tabetha asked the court what she was supposed to do. The trial judge responded by asking whether she understood that part of the issue was that she had not been able to get B.C. to a doctor and get him the care that was required. Tabetha replied that she did not understand this because it was not true. Tabetha said that no doctor had seen B.C. which is why he kept going to the hospital because he was on a waiting list and there was nothing she could do. At the end of this interchange, Tabetha accused the court of slandering her.

¶ 31    After hearing all the evidence presented, the trial court found that B.C. was neglected based on a lack of care and an injurious environment. Regarding Ki.C. and Ka.C., the court also found

9

neglect based on an injurious environment. The court noted Tabetha's mental history, Tabetha's inability to provide for the mental health care of B.C., the history of domestic violence, and the recent incidence of domestic violence involving a gun.

¶ 32    After the hearing, adjudication orders for the minors were entered and the case was subsequently scheduled for disposition and a permanency hearing which, after several delays, was held on February 22, 2021.

¶ 33    At the conclusion of the February 22, 2021, hearing, the trial court entered an order finding that it was in the best interests of all three minors that they remain in the custody of the DCFS guardianship administrator. The court found Keith and Tabetha were unable to care for Ki. C. and Ka.C. and set a permanency goal for both Ki. C. and Ka. C. of return home within 12 months.

¶ 34                                II. JURISDICTION

¶ 35    Keith filed a notice of appeal from the trial court's February 22, 2021, rulings on March 15, 2021, which was amended on March 18, 2021. Tabetha filed a notice of appeal from the trial court's rulings on March 18, 2021. On March 29, 2021, this court granted the guardian *ad litem*'s motion to consolidate the cases. We have jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the trial court in civil cases.

¶ 36                                III. ANALYSIS

¶ 37    We note that although Tabetha's notice of appeal included all three minors, she acknowledges in her brief that she is not challenging the court's findings as to B.C. We also note that the parents do not raise any issue as to the dispositional orders, except insofar as they are based on the findings of neglect made at the adjudication hearing.

¶ 38    On appeal, Tabetha and Keith contend that the adjudication findings that Ki.C. and Ka.C.

were neglected due to an injurious environment were against the manifest weight of the evidence. They both argue that the single domestic violence incident was an insufficient basis for a finding of neglect due to an injurious environment because the only minor who was home during the incident was Ki.C., and she was unharmed. Moreover, Ki.C. called the police at Tabetha's direction; led the officers to the scene; Keith did not prevent her from doing so nor did he punish her; no evidence was presented that Keith harmed the minors; no evidence was presented that Tabetha perpetrated domestic batteries; and it was unclear whether Keith lived in the apartment. Further, Tabetha contends that even if Keith lived in her home, any potential for an injurious environment on that basis ended with his arrest, and he remains incarcerated. They argue that the testimony about and references in the medical records to other incidents of domestic violence are vague and not specific.

¶ 39    Tabetha and Keith also take issue with the second basis of the neglect finding, namely that they did not follow up on B.C.'s mental health concerns. Tabetha argues that her options were limited and that the agency to which they were referred put them on a waiting list several times. She also noted that B.C. had spent a positive summer with his grandfather with no concerns. Tabetha also contends that there was no showing that Ka.C. had severe mental health conditions like B.C., and Ki.C.'s depressive episode in 2018 was appropriately handled at that time.

¶ 40                                    A. Procedural Framework

¶ 41    The Juvenile Court Act of 1987 (Act) sets forth the statutory framework for this case. 705 ILCS 405/1-1 *et seq.* (West 2018); *In re Ashli T.*, 2014 IL App (1st) 132504, ¶ 12. In all proceedings under the Act, the best interest of the child is the primary concern of the court. *In re Ashley F.*, 265 Ill. App. 3d 419, 424 (1994).

¶ 42    In this case, the State initiated proceedings by filing a petition for adjudication of wardship

for the minors and a motion for temporary custody, alleging that there was probable cause to believe that they were abused and neglected based on an injurious environment due to the alleged untreated mental health concerns of their sibling, B.C. The petition was later amended to include an allegation of domestic violence in the home between Tabetha and Keith. At the adjudication hearing on November 19, 2019, the trial court entered adjudication orders for B.C., Ki.C. and Ka.C., finding that Ki.C. and Ka.C. were neglected due to an injurious environment.

¶ 43     Section 2-3(1)(a) of the Act defines a neglected minor to include one "who is not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being, or other care necessary for his or her well-being, including adequate food, clothing and shelter." 705 ILCS 405/2-3(1)(a) (West 2018). "Neglect" is generally defined as:

> "'the failure to exercise the care that circumstances justly demand and includes both willful and unintentional disregard of parental duties. [Citation.] The term is not a 'fixed and measured meaning' and it takes its content from specific circumstances of each case. [Citation.] Accordingly, cases involving an adjudication of neglect and wardship are *sui generis* and each case must be decided on the basis of its own unique circumstances. [Citation.]" *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 36 (quoting *In re Christopher S.*, 364 Ill. App. 3d 76, 88 (2006)).

¶ 44     Section 2-3(1)(b) of the Act states that those who are neglected include "any minor under 18 years of age whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2018). The term "injurious environment" is not a term that has a precise definition but has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children. *In re R.G.*, 2012 IL App (1st) 120193, ¶ 45; *In re. D.W.*, 386 Ill. App. 3d 124,

135 (2008).

¶ 45     The focus of our inquiry is whether the minors are neglected, not whether the parents are neglectful. *In re Arthur H.*, 212 Ill. 2d 441, 465 (2004); *Tamesha T.*, 2014 IL App (1st) 132986, ¶ 36. The State has the burden to prove the allegations by a preponderance of the evidence. *Id.* In any proceeding initiated pursuant to the Act, the paramount consideration is the best interest of the child. *In re N.B.*, 191 Ill. 2d 338, 343 (2000).

¶ 46     It is well-settled that the State may use the evidence of neglect and abuse of one child as evidence of abuse and neglect of another child who lives in the same household and for whom the same parent is responsible. *R.G.*, 2012 IL App (1st) 120193, ¶ 49; *In re R.R.*, 409 Ill. App. 3d 1041, 145 (2011).

¶ 47                               B. Standard of Review

¶ 48     When making determinations of neglect, the trial court has wide discretion, and the findings, which are based on its opportunity to observe the demeanor and conduct of the parties and witnesses, must be given great weight. *Id*. Moreover, its determination will not be disturbed unless it is against the manifest weight of the evidence. *In Interest of K.G.*, 288 Ill. App. 3d 728, 735 (1997). A trial court's finding is against the manifest weight of the evidence if a review of the record clearly demonstrates that the opposite result would be the proper one. *Id*. The juvenile court is in the best position to observe the testimony of the witnesses, assess their credibility, and weigh the relative evidence. *In re Sharena H*., 366 Ill. App. 3d 405, 415 (2006). We may not substitute our judgment for that of the trial court regarding the credibility of the witnesses, the weight to be given to the evidence, or the inferences to be drawn. *In re D.F*., 201 Ill.2d 476, 498-99 (2002).

¶ 49                               C. The Trial Court's Finding

¶ 50     Here, the minors were found neglected due to an "injurious environment" based in part on

a history of domestic violence between the parents and one specific recent incident in which Keith hit Tabetha on the head with a gun and in which Ki.C. had to call the police. The finding was also based on mental health treatment issues including the parents' failure to adequately respond to serious episodes involving B.C. and to ensure adequate care for Ki.C. and Ka.C.

¶ 51    In reference to the domestic violence, Tabetha and Keith point out that there was specific evidence of only the one incident of domestic violence in August 2019. However, there were references to earlier incidents throughout the documentary evidence and Ms. Dunlap testified that Tabetha admitted to her that she had a history of domestic violence with Keith.

¶ 52    Moreover, the one incident that was described in detail, and was specifically alleged in the amended petition, involved an illegally possessed gun with an extended magazine that Keith had used to hit Tabetha on the head while at least one of the minors was present. Keith then ran from and was chased by the police.

¶ 53    This case is different from *In re S.S.*, 313 Ill. App. 3d 121 (2000), on which both parents rely. In that case, the court had relied on a single incident of domestic violence that did not involve a weapon and for which no children were present. Also, that case appears to have rested on a mistaken understanding that a neglect finding had to be based on a finding that both parents were responsible for the abuse and neglect of the minors. *Id.* at 127. After the *S.S.* case was decided, our supreme court made clear that, to the contrary, it is the status of the child and not the relative fault of each parent that must be determined at the adjudication. *Arthur H.*, 212 Ill. 2d at 465. In any event, the incident in this case was far more serious and it was accompanied by admissions from Tabetha that she and Keith had a history of domestic violence.

¶ 54    In addition, the trial court's finding here that these minors were in an injurious environment was also based on the fact that these minors lived in a home with their brother B.C., whose serious

mental health issues were neither controlled nor fully addressed. Tabetha points out that B.C.'s mental health needs were not disregarded altogether, but rather that a follow-up plan for consistent care was not adhered to. While Tabetha experienced some understandable frustration in getting help to address B.C.'s extreme behaviors, there were repeated instances in which B.C. missed medical appointments, ran out of medication, and behaved in a way that created a stressful and injurious environment for his siblings.

¶ 55     Moreover, while Tabetha testified that she was not responsible for the failure in follow-up—because B.C. was placed on a waiting list for Ada S. McKinley multiple times, his social security benefits were cut and providers would not accept her medical card, and the other agency that was referred to her was too far for her to travel to—the trial court clearly did not credit much of this testimony. As noted above, it is the trial court that must make credibility findings and we must defer to those findings.

¶ 56     In addition, the 2018 medical records for Ki.C. demonstrated that she was also hospitalized for a depressive episode. Ms. Dunlap testified that she was told by the nurse from Ki.C's and Ka.C's doctor's office that mental health evaluations were recommended for them but were never done. Even if, as Tabetha claimed in her testimony, she had requested these evaluations, the fact remained that they were not completed.

¶ 57     We do not doubt that Tabetha made attempts to deal with her childrens' mental health issues. However, the trial court's finding that, despite those efforts, the environment for these children was injurious, is simply not against the manifest weight of the evidence.

¶ 58                                   IV. CONCLUSION

¶ 59     For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 60     Affirmed.

¶ 61    JUSTICE ODEN JOHNSON, specially concurring:

¶ 62    While I concur that the current caselaw supports the trial court's findings that Ki.C. and Ka.C. were neglected based on an injurious environment, I nonetheless write separately because I believe that the law should not be applied in a blanket manner but have a more individualized application. Abuse and neglect cases should be based on the specific factual circumstances presented in each case for a more fair and equitable result.

¶ 63    Specific to this case, the circuit court remarked that "very little that [respondent-mother] said made any sense" and in its findings gave no explanation as to why her testimony was not credible. There were no steps taken by the circuit court to attempt to understand her, and the State never bothered to cross examine her. However, my review of the record revealed that while she may have been unable to articulate her position well, she appeared very aware of her children's needs and persistent in her requests for assistance despite being wait-listed at Ada S. McKinley. Both social workers testified that respondent-mother initiated discussions regarding B.C.'s mental health and asked for services. Nevertheless, there is no evidence in the record that a service plan was presented to assist respondent-mother with obtaining mental health assistance or that any other DCFS personnel intervened with Ada S. McKinley on her behalf. Further, there was no testimony that DCFS assisted or offered to assist respondent-mother with transportation to the other provider recommended by the hospital in June 2019; only that intact services were offered in July 2019 just before the case was slated for court.

¶ 64    While respondent-mother had two prior indicated findings of abuse by DCFS, they were both related to the healthcare of B.C. Caring for a child with special needs requires a heightened sense of awareness and standard of care that might not otherwise be required for a child without

special needs. Logic dictates that a parent that is capable of caring for two children might become overwhelmed with a child with special needs, which I believe is the case here.

¶ 65    Regarding the August 2019 domestic violence incident, while in no way minimizing the situation, I do believe that respondent-mother gave the appropriate instruction to 16-year-old Ki.C. to call the police. As a result, the perpetrator was removed from the residence. This is as much as could be asked from any mother in this given situation.

¶ 66    Overall, the record made clear that the circumstances of this case arose primarily due to respondent-mother's societal status and her reliance on public resources. That said, I believe we should take a closer look at how these particular cases are addressed and courts should ensure that the children have been afforded all possible resources necessary to enable the child to remain in the custody of their parents prior to entering a removal or termination order. See *In re N.B.*, 191 Ill. 2d 338, 343 (2000) (In any proceeding initiated pursuant to the Act, the paramount consideration is the best interests of the child).